In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-4219

RICHARD TOMIC,

*Plaintiff-Appellant*,

*v.*

CATHOLIC DIOCESE OF PEORIA,

*Defendant-Appellee*.

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 C 1184—**Michael M. Mihm**, *Judge*.

———————

ARGUED DECEMBER 5, 2005—DECIDED APRIL 4, 2006

———————

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*.  This age-discrimination suit by the former music director and organist of a Catholic diocese, dismissed on a motion to dismiss, requires us to consider the scope of the rule that federal courts may not exercise jurisdiction over the internal affairs of religious associations.

Richard Tomic was employed as the music director and organist both of a Roman Catholic church in Peoria (St. Mary's Cathedral) and of the Peoria diocese itself. The job description for the diocesan position required him "to assist the Office of Divine Worship in preparing and celebrating

various diocesan liturgies" and "in planning and celebrating liturgical events as requested." The description of his church job required him to play the organ for masses and other events, including weddings and funerals, and, in his capacity as music director, to "prepare music for all Parish masses and liturgies . . . in consultation with the Rector/Pastor where necessary," as well as to recruit, train, direct, and rehearse the members of the chorus.

A dispute with the bishop's assistant concerning the scheduling of Easter music culminated in Tomic's dismissal from both positions; he was 50 years old and was replaced by a much younger person. The diocesan employment handbook describes the diocese as "an Equal Opportunity Employer" that does not discriminate on account of race, sex, etc.—including age—with certain exceptions (such as that employees "shall conform to the moral standards of the Catholic faith") that are not claimed to be applicable to Tomic. In dismissing the suit, the district judge did not explore the dispute between Tomic and the bishop's assistant or decide whether age had played any role in Tomic's dismissal.

Federal courts are secular agencies. They therefore do not exercise jurisdiction over the internal affairs of religious organizations. E.g., *Jones v. Wolf*, 443 U.S. 595, 602 (1979); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709-10, 713-15 (1976); *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449-50 (1969); *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 427-28 (2d Cir. 2002); *Dixon v. Edwards*, 290 F.3d 699, 714-15 (4th Cir. 2002); Note, "Judicial Intervention in Disputes over the Use of Church Property," 75 *Harv. L. Rev.* 1142 (1962). When Article III of the Constitution created the federal judicial power,

England had, as part of its established church, ecclesiastical courts (with curious names, such as the "Court of Arches" and the "Court of Peculiars"). 3 William Blackstone, *Commentaries on the Laws of England*, ch. 5 (1768). Since the United States was not to have a national church, the federal judicial power was not envisaged as extending to the resolution of ecclesiastical controversies. In contrasting our situation with that of England, the Supreme Court remarked:

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728-29 (1871); see also Note, *supra*, at 1155-56.

A suit to remove a priest on the ground that he is a heretic, or to reinstate a parishioner who has been excommunicated, thus has never been justiciable in the federal courts. E.g., *Serbian Eastern Orthodox Diocese v. Milivojevich*, *supra*, 426 U.S. at 698; *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139-40 (1872); cf. *Montano v. Hedgepeth*, 120 F.3d 844, 850-51 (8th Cir. 1997). Even if the suit does not involve an issue of religious doctrine, but concerns merely the governance structure of the church, the courts will not assume jurisdiction if doing so would interfere with the church's management. *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *Young v. Northern Illinois Conference of United Methodist Church*, 21 F.3d 184, 187 (7th Cir. 1994); *Combs v. Central Texas Annual Conference of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999); *EEOC v. Catholic University of America*, 83 F.3d 455, 462-63 (D.C. Cir. 1996). These cases "affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Id*. at 462, citing *Kedroff*; see also *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir. 2000). Also pertinent is *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979). The issue in that case was whether the National Labor Relations Act applied to lay teachers in Catholic schools. The Court held not, because "the resolution of [unfair labor] charges by the [National Labor Relations Board], in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission. It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very

process of inquiry leading to findings and conclusions." *Id*. at 502.

Thus "the First Amendment concerns [with assuming jurisdiction in ecclesiastical cases] are two-fold. The first concern is that secular authorities would be involved in evaluating or interpreting religious doctrine. The second quite independent concern is that in investigating employment discrimination claims by ministers against their church, secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal." *Combs v. Central Texas Annual Conference of United Methodist Church, supra*, 173 F.3d at 350 (citations omitted). This second aspect of the internal-affairs doctrine is called the "ministerial exception" to the exercise of federal jurisdiction. E.g., *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 702-03 (7th Cir. 2003).

Both aspects govern decision even when—in fact most commonly when—the complaint is not based on and does not refer to religious doctrine or church management (as in most Title VII and other employment-discrimination suits) but it is apparent that a controversy over either may erupt in the course of adjudication. E.g., *id.*; *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000).

The ministerial exception, and the hands-off approach more generally, do not place the internal affairs of religious organizations wholly beyond secular jurisdiction. If a local congregation of a hierarchical sect seized the local church, changed the locks, and declared itself an independent religious organization, a court would, upon suit by the hierarchy, enjoin the seizure. *Jones v. Wolf, supra*, 443 U.S. at 602-03; *Watson v. Jones, supra*, 80 U.S. (13 Wall.) at 726-29; *Maryland & Virginia Eldership of Churches of God*

*v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 367-68
(1970) (per curiam); *Church of God in Christ, Inc. v. Graham*,
54 F.3d 522, 525-26 (8th Cir. 1995); cf. *Presbyterian Church in
the United States v. Mary Elizabeth Blue Hull Memorial Presby-
terian Church*, *supra*, 393 U.S. at 449-50. Or if to avoid having
to pay the minimum wage to its janitor a church designated
all its employees "ministers," the court would treat the
designation as a subterfuge, see *Dole v. Shenandoah Baptist
Church*, 899 F.2d 1389, 1396-97 (4th Cir. 1990); cf. *EEOC v.
Roman Catholic Diocese of Raleigh*, *supra*, 213 F.3d at 801;
*Bollard v. California Province of the Society of Jesus*, 196 F.3d
940, 947 (9th Cir. 1999), just as the Internal Revenue Service
denies tax exemptions to religious associations that are not
bona fide. *Living Faith, Inc. v. Commissioner*, 950 F.2d 365,
372-73 (7th Cir. 1991); *United States v. Jeffries*, 854 F.2d 254,
257 (7th Cir. 1988); *Spiritual Outreach Society v. Commissioner*,
927 F.2d 335, 339 (8th Cir. 1991).

These examples show that federal courts cannot always
avoid taking a stand on a religious question. In the sei-
zure case, there might be a dispute over whether, under
the internal law of the sect in question, local church prop-
erty was owned by the congregation or by the sect. The
court would have to answer the question in order to deter-
mine whether to issue the injunction; and though
the tendency of the courts is simply to accept whatever
answer the highest church authority gives to the question of
ownership, at a minimum the court must determine what is
that highest authority. In the janitor's case, the court would
have to determine whether under the actual law of the
church in question (and not as a subterfuge) janitors really
were ministers. The internal-affairs exception is limited in
other ways as well. A church could not subject its clergy to
corporal punishment or require them to commit criminal

acts. E.g., *Employment Division v. Smith*, 494 U.S. 872 (1990); *United States v. Indianapolis Baptist Temple*, 224 F.3d 627, 629 (7th Cir. 2000). But it would not be constrained in its dealings with them by employment laws that would interfere with the church's internal management, including antidiscrimination laws. E.g., *Alicea-Hernandez v. Catholic Bishop of Chicago*, *supra*, 320 F.3d at 702-04 (Title VII); *EEOC v. Roman Catholic Diocese of Raleigh*, *supra*, 213 F.3d at 800-01 (ditto); *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1356-57 (D.C. Cir. 1990) (ADEA).

It might seem that unless a church had a doctrine placing limitations of age, race, ethnic origin, disability, or sex on ministers, the application of laws forbidding employment discrimination would not involve the court in theological controversy. But this is not correct, because the church would be likely to defend its employment action on grounds related to church needs rooted in church doctrine. See *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360, 363 (8th Cir. 1991). The reference in the complaint in this case to the dispute between Tomic and the bishop's assistant suggests that if the suit were permitted to go forward, the diocese would argue that he was dismissed for a religious reason—his opinion concerning the suitability of particular music for Easter services—and the argument could propel the court into a controversy, quintessentially religious, over what is suitable music for Easter services. Tomic would argue that the church's criticism of his musical choices was a pretext for firing him, that the real reason was his age. The church would rebut with evidence of what the liturgically proper music is for an Easter Mass and Tomic might in turn dispute the church's claim. The court would be asked to

resolve a theological dispute. *DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2d Cir. 1993).

This assumes, however, that as organist and music director, Tomic, unlike the janitor of St. Mary's Cathedral, really did have religious duties. See *id.* at 171-72. So far as his role as organist is concerned, his lawyer says that all Tomic did was play music. But there is no one way to play music. If Tomic played the organ with a rock and roll beat, or played excerpts from *Jesus Christ Superstar*, at an Easter Mass he would be altering the religious experience of the parishioners. Among his duties as music director was that of selecting the music to be played at the various masses. That duty required him to make a discretionary religious judgment because the Catholic Church does not have rules specifying what piece of music is to be played at each type of mass. Raymond F. Glover, "Liturgical Music: Its Forms and Functions," in *Liturgy and Music: Lifetime Learning* 231, 247-48 (Robin A. Leaver & Joyce Ann Zimmerman, eds. 1998).

At argument Tomic's lawyer astonished us by arguing that music has in itself no religious significance—its only religious significance is in its words. The implication is that it is a matter of indifference to the Church and its flock whether the words of the Gospel are set to Handel's *Messiah* or to "Three Blind Mice." That obviously is false. The religious music played at a wedding is not necessarily suitable for a funeral; and religious music written for Christmas is not necessarily suitable for Easter. Even Mozart had to struggle over what was suitable church music with his first patron, Archbishop Colloredo, whom the Mozart family called the "arch-booby." "[M]usic is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred. Music is an integral part of

many different religious traditions," including the Catholic tradition. *EEOC v. Roman Catholic Diocese of Raleigh*, *supra*, 213 F.3d 795, 802-03; see also *Starkman v. Evans*, 198 F.3d 173, 176-77 (5th Cir. 1999). Like the plaintiff in the *Starkman* case, Tomic "performed tasks that were 'traditionally ecclesiastical or religious.' " *Id*. at 177.

The rector or bishop could override Tomic's choices of what music to play. But it is easy to see how disagreement with his choices could convince the ecclesiastical authorities that they would be better off with someone else in the job. If as in this case the music director is at least 40 years old and therefore within the class protected by the Age Discrimination in Employment Act, the ability of the church and the diocese to remove him will be inhibited unless the ministerial exception is applicable. Since, as we have just seen, Tomic's duties, unlike those, say, of the person who tunes the organ in St. Mary's Cathedral, had a significant religious dimension, Tomic forfeited his rights under the Act.

*DeMarco v. Holy Cross High School*, *supra*, is a case just across the line from this one. The plaintiff in an age-discrimination suit, DeMarco was a math teacher at a Catholic school. He had minor religious duties—leading the students in prayers and taking them to Mass—but the court thought it unlikely that a trial of his age-discrimination claim would entail an examination of religious doctrine. The key passage in the court's opinion is the following: "the references to Holy Cross's religious mission are linked to two very specific allegations: that DeMarco failed to attend Mass and to lead his students in prayers. Given that the religious duties that DeMarco allegedly failed to carry out are easily isolated and defined, we are confident that the able district judge will be able to focus the trial upon whether DeMarco

was fired because of his age or because of failure to perform religious duties, and that this can be done without putting into issue the validity or truthfulness of Catholic religious teaching." 4 F.3d at 172. DeMarco either did or did not lead his students in prayer and attend mass. These were simple questions of fact, no different from whether he correctly added 2 plus 2, and could be answered without reference to church doctrine. That is not true with respect to the wisdom or propriety of Tomic's choice of music to play at an Easter Mass.

The court in *DeMarco* distinguished the Supreme Court's decision in *Catholic Bishop* on the ground that the National Labor Relations Act imposes more comprehensive duties on employers than the age-discrimination law. 4 F.3d at 169. Fair enough; but *DeMarco* also distinguished cases in which the employee is a member of the clergy, *id.* at 171-72; and the music director of a Catholic church and diocese is more like a clergyman than a math teacher. Also distinguishable is *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 303-06 (1985), a replay of *Catholic Bishop* except that in *Alamo* the employees were not parochial-school teachers but instead the employees of commercial enterprises owned by the church. The Court could not see how even the regulation of the enterprises' labor practices by the Fair Labor Standards Act could inject a reviewing court into a religious dispute.

But we must consider whether it makes a difference that the diocese represents itself to be an "equal opportunity" employer, specifically with respect to age. Tomic argues that this representation in the employee handbook, though it disclaims creating a contractual obligation, should estop the diocese to deny that it is subject to the age-discrimination law. Now it is very unlikely that

the representation should be interpreted to embrace religious functionaries, such as the music director. Among the forms of discrimination that the handbook forbids is discrimination on grounds of sex, though women of course cannot be Catholic priests. But in any event the ministerial exception, like the rest of the internal-affairs doctrine, is not subject to waiver or estoppel. *Minker v. Baltimore Annual Conference of United Methodist Church, supra*, 894 F.2d at 1356-57. A federal court will not allow itself to get dragged into a religious controversy even if a religious organization wants it dragged in. There is an analogy to the refusal of the courts to honor certain choice of law provisions in contracts. Generally, such a provision is honored. If a contract between citizens of Illinois specifies that the law of New York shall govern any dispute arising from the contract, a court in Illinois will apply that law. But as we said in *Lloyd v. Loeffler*, 694 F.2d 489, 495 (7th Cir. 1982), if the parties stipulated that their dispute would be governed by the Code of Hammurabi the court would refuse to honor the stipulation. Judges have an interest independent of party preference for not being asked to decide an issue that they cannot resolve intelligently. Americans would, moreover, be deeply offended at the thought of their secular courts taking on the additional role of religious courts, as if the United States were a theocracy.

After the oral argument in this case, the Second Circuit held (over dissent) that the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* (which in the wake of *City of Boerne v. Flores*, 521 U.S. 507 (1997), is limited to federal action, *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003)) amended the ADEA to wipe out the ministerial exception and substitute RFRA's standard, which requires deciding whether a particular law imposes a substantial burden on religious activity. *Hankins v. Lyght*,

438 F.3d 163, 169 (2d Cir. 2006). The decision would if sound invalidate the many decisions in this and other circuits recognizing the ministerial exception to federal employment discrimination law. The decision is unsound. RFRA is applicable only to suits to which the government is a party. See 42 U.S.C. §§ 2000bb-1(b), (c); *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120-21 (9th Cir. 2000); *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 834-35 (9th Cir. 1999). "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c).

It is hardly to be imagined, moreover, that in seeking to broaden the protection of religious rights, Congress, dropping nary a hint, wiped out a long-established doctrine that gives greater protection to religious autonomy than RFRA does. Indeed a serious constitutional issue would be presented if Congress by stripping away the ministerial exception required federal courts to decide religious questions. The exception is based on the establishment and free-exercise clauses of the First Amendment, see, e.g., *Combs v. Central Texas Annual Conference of United Methodist Church, supra*, 173 F.3d at 350; *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985), which place tight limits on governmental authority to regulate religion. In the *Catholic Bishop* case, the majority adopted a strained interpretation of the National Labor Relations Act in order to avoid confronting this constitutional issue. The dissent thought the strain too great, but did not deny the existence of such an issue, or intimate a view on how it should be resolved. 440 U.S. at 517-18.

It is no surprise that the appellant in *Hankins* did not even argue RFRA; nor does Tomic.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*