*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0065p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
         *Plaintiff-Appellant (09-1134),*

CHERYL PERICH,
     *Intervenor Plaintiff-Appellant (09-1135),*


          *v.*


HOSANNA-TABOR EVANGELICAL LUTHERAN
CHURCH AND SCHOOL,
               *Defendant-Appellee.*

Nos. 09-1134/1135

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-14124—Patrick J. Duggan, District Judge.

Argued:  October 6, 2009

Decided and Filed:  March 9, 2010

Before:  GUY, CLAY, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Dori K. Bernstein, U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Washington, D.C., James E. Roach, VERCRUYSSE MURRAY &
CALZONE PC, Bingham Farms, Michigan, for Appellants.  Deano C. Ware, DEANO C.
WARE, P.C., Redford, Michigan, for Appellee.  **ON BRIEF:**  Dori K. Bernstein, U.S.
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., James E.
Roach, VERCRUYSSE MURRAY & CALZONE PC, Bingham Farms, Michigan, for
Appellants.  Deano C. Ware, DEANO C. WARE, P.C., Redford, Michigan, for Appellee.

       CLAY, J., delivered the opinion of the court, in which GUY, J., joined.  WHITE, J.
(pp. 19-22), delivered a separate concurring opinion.

1

———————————

## OPINION

———————————

CLAY, Circuit Judge.   Plaintiffs, Equal Employment Opportunity Commission ("EEOC") and Cheryl Perich, appeal from the district court's order granting summary judgment in favor of Defendant Hosanna-Tabor Evangelical Lutheran Church and School ("Hosanna-Tabor") in this action alleging discrimination in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12117(a) (the "ADA").   For the reasons set forth below, we **VACATE** the district court's order and **REMAND** the case for further proceedings consistent with this opinion.

## BACKGROUND

This case arises out of Perich's employment relationship with Hosanna-Tabor, which terminated Perich from her teaching position on April 11, 2005.   Hosanna-Tabor, an ecclesiastical corporation affiliated with the Lutheran Church-Missouri Synod (the "LCMS"), operates a church and school in Redford, Michigan.   The school teaches kindergarten through eighth grades.   The faculty consists of two types of teachers: (1) "lay" or "contract" teachers, and (2) "called" teachers.   Contract teachers are hired by the Board of Education for one-year renewable terms of employment.   Called teachers are hired by the voting members of the Hosanna-Tabor church congregation upon the recommendation of the Board of Education, Board of Elders, and Board of Directors.   Called teachers are hired on an open-ended basis and cannot be summarily dismissed without cause.   They can also apply for a housing allowance on their income taxes provided that they are conducting activities "in the exercise of the ministry."   (Dist. Ct. R.E. 25 Ex. Q).

To be eligible for a "call," a teacher must complete the colloquy classes required by the LCMS, which focus on various aspects of the Christian faith.   After completing the colloquy, a teacher receives a certificate of admission into the teaching ministry, and the Michigan District of the LCMS places the teacher's name on a list that can be accessed by schools that need teachers.   Once selected by a congregation, a called teacher receives the title of "commissioned minister."

In July 1999, Hosanna-Tabor hired Perich as a contract teacher to teach kindergarten on a one year contract from August 15, 1999 to June 15, 2000. After Perich completed the required colloquy classes at Concordia College in February 2000, Hosanna-Tabor hired Perich as a called teacher on March 29, 2000. Perich continued teaching kindergarten until the end of the 2002-2003 year. She taught fourth grade during the 2003-2004 school year, and she was assigned to teach third and fourth grades for the 2004-2005 school year. From the time she was hired as a called teacher until her termination, Perich was listed as a commissioned minister in the LCMS. At least once during her tenure, Perich claimed the housing allowance on her income taxes.

After Perich was hired as a called teacher, her employment duties remained identical to the duties she performed as a contract teacher. Perich taught math, language arts, social studies, science, gym, art, and music. Language arts instruction included reading, English, spelling, and handwriting. Music instruction included secular music theory and playing the recorder, using the same music book as the local public school. During the 2003-2004 school year, Perich taught computer training as well.

Perich also taught a religion class four days per week for thirty minutes, and she attended a chapel service with her class once a week for thirty minutes. Approximately twice a year, Perich led the chapel service in rotation with other teachers. Perich also led each class in prayer three times a day for a total of approximately five or six minutes. During her final year at Hosanna-Tabor, Perich's fourth grade class engaged in a devotional for five to ten minutes each morning. In all, activities devoted to religion consumed approximately forty-five minutes of the seven hour school day.

Hosanna-Tabor's website indicates that the school provides a "Christ-centered education" that helps parents by "reinforcing bible principals [sic] and standards." Hosanna-Tabor describes its staff members as "fine Christian role models who integrate faith into all subjects." Perich valued the freedom a sectarian school afforded to "bring God into every subject taught in the classroom." (Dist. Ct. R.E. 37 Ex. 1 ¶ 23). However, Perich taught secular subjects using secular textbooks commonly used in public schools, and she can only recall two instances in her career when she introduced religion into secular subjects.

Furthermore, Hosanna-Tabor does not require teachers to be called or even Lutheran. Non-Lutheran teachers have identical responsibilities as Lutheran teachers, including teaching religion classes and leading chapel service. Members of the custodial staff and at least one teacher who worked at Hosanna-Tabor were not Lutheran.

At a church golf outing in June 2004, Perich suddenly became ill and was taken to the hospital. She underwent a series of medical tests to determine the cause. Perich's doctors had not reached a definitive diagnosis by August, and Hosanna-Tabor administrators suggested that Perich apply for a disability leave of absence for the 2004-2005 school year. The principal of Hosanna-Tabor, Stacy Hoeft, informed Perich that she would "still have a job with [Hosanna-Tabor]" when she regained her health. (Dist. Ct. R.E. 24 Ex. 6). Perich agreed to take a disability leave and did not return to work at the beginning of the 2004-2005 school year. Throughout her leave, Perich regularly provided Hoeft with updates about her condition and progress.

On December 16, 2004, Perich informed Hoeft by email that her doctor had confirmed a diagnosis of narcolepsy and that she would be able to return to work in two to three months once she was stabilized on medication. On January 19, 2005, Hoeft asked Perich to begin considering and discussing with her doctor what she might be able to do upon return. Perich responded the same day that she had discussed her work day and teaching responsibilities with her doctor, and he had assured her that she would be fully functional with the assistance of medication. Perich reiterated this sentiment with additional explanation on January 21, 2005.

Also on January 21, 2005, Hoeft informed Perich that the school board intended to amend the employee handbook to request that employees on disability for more than six months resign their calls to allow Hosanna-Tabor to responsibly fill their positions. Such resignations would not necessarily prevent reinstatement of these employees' calls upon their return to health. Perich had been on disability for more than five months when she received this email.

On January 27, 2005, Perich wrote to Hoeft that she would be able to return to work between February 14 and February 28, 2005. Hoeft responded with surprise, because Perich

had indicated a few days before that she had been unable to complete her disability forms because of her condition. Hoeft expressed concern that Perich's condition would jeopardize the safety of the students in her care. Hoeft also indicated that Perich would not be teaching the third and fourth grades upon return, because the substitute teacher had a contract that ran through the end of the school year.[1] Furthermore, she indicated that the third and fourth grade students had already had two teachers that year and having a third would not provide a good learning environment for them.

Three days later, at the annual congregational "shareholder" meeting, Hoeft and the school board expressed their opinion that it was unlikely that Perich would be physically capable of returning to work that school year or the next. Consequently, the congregation adopted the Board's proposal to request that Perich accept a peaceful release agreement wherein Perich would resign her call in exchange for the congregation paying for a portion of her health insurance premiums through December 2005. On February 7, 2005, the Board selected Chairman Scott Salo to discuss this proposal with Perich.

On February 8, 2005, Perich's doctor gave her a written release to return to work without restrictions on February 22, 2005. The next day Salo contacted Perich to discuss her employment. Perich instead requested to meet with the entire school board. At the meeting on February 13, 2005, the Board presented the peaceful release proposal, and Perich responded by presenting her work release note. The Board continued to express concerns about Perich's ability to supervise students for the entire day. Perich explained that, as of her doctor's release on February 22, 2005, she would no longer be eligible for disability coverage and would be required to return to work. The Board, however, continued to request that Perich resign and asked her to respond to the peaceful release proposal by February 21, 2005.

---

[1]In November 2004, the Board of Directors began making plans to fill Perich's position. The Board first decided to combine three grades into one classroom with one teacher and one part time teaching assistant. In response to teacher and parent complaints concerning the stress of teaching three grades with one teacher, the Board hired a long-term substitute for Perich. Hoeft notified Perich of the Board's decision on January 10, 2005.

Shortly after 9:00 p.m. on February 21, 2005, Perich emailed Hoeft to confirm that she had decided not to resign from her position and that she planned to return to work in the morning. When Perich reported to work on February 22, 2005, the school did not have a job for her. Because the school handbook states that failure to return to work on the first day following the expiration of an approved medical leave may be considered a voluntary termination, Perich refused to leave school grounds until she received a letter acknowledging that she appeared for work. Perich received a letter signed by Hoeft and Salo, which said that Perich had provided improper notification of her return to work and asked that she continue her leave to allow the congregation a chance to develop a possible plan for her return. Perich took the letter and left the premises.

Later that day, Perich spoke with Hoeft over the phone. Hoeft told Perich that she would likely be fired, and Perich told Hoeft that she would assert her legal rights against discrimination if they were unable to reach a compromise. Perich asked Hoeft to transmit that information to the Board. Perich also sent Hoeff an email stating that her doctor had reaffirmed that she was healthy and ready to return to work. Following the Board's meeting on February 22, 2005, Salo sent Perich a letter describing Perich's conduct as "regrettable" and indicating that the Board would review the process of rescinding her call based on her disruptive behavior. (Dist. Ct. R.E. 22 Ex. B).

On March 19, 2005, Salo sent Perich a follow-up letter stating that, based on Perich's insubordination and disruptive behavior on February 22, 2005, the Board would request rescinding Perich's call at the next voter's meeting on April 10, 2005. The letter also stated that Perich had "damaged, beyond repair" her working relationship with Hosanna-Tabor by "threatening to take legal action," and it laid out the voting procedure by which the congregation could depose a called minister. (Dist. Ct. R.E. 24 Ex. 1). Finally, the letter again proposed the peaceful release offer and gave Perich until April 8, 2005 to accept the offer.

On March 21, 2005, Perich's lawyer sent a letter to Hosanna-Tabor's lawyer stating that Hosanna-Tabor's actions amounted to unlawful discrimination. The letter asked Hosanna-Tabor to respond seeking an amicable resolution to the matter, or else Perich would be forced to bring a lawsuit or file a complaint with the EEOC. On April 10, 2005, the congregation voted to rescind Perich's call. The next day, Salo informed Perich of her termination.

On May 17, 2005, Perich filed a charge of discrimination and retaliation with the EEOC alleging that Hosanna-Tabor had discriminated and retaliated against her in violation of her rights under the ADA. On September 28, 2007, the EEOC filed a complaint against Hosanna-Tabor in the United States District Court for the Eastern District of Michigan alleging one count of retaliation in violation of the ADA. Perich moved to intervene on March 11, 2008; she was granted leave and filed her own complaint on April 10, 2008, which added a cause of action under Michigan's Persons with Disabilities Civil Rights Act, M.C.L. §37.1201(b) (the "PDCRA"). Perich and Hosanna-Tabor each filed motions for summary judgment on July 15, 2008. On October 23, 2008, the district court granted summary judgment in favor of Hosanna-Tabor, dismissing the claim on the grounds that the court could not inquire into her claims of retaliation because they fell within the "ministerial exception" to the ADA. Perich timely sought reconsideration pursuant to Federal Rule of Civil Procedure 59(e) on November 6, 2008, which was denied on December 3, 2008. Perich and the EEOC timely filed notices of appeal on January 30, 2009.

**DISCUSSION**

**I. Standard of Review**

This Court reviews *de novo* a district court's order of dismissal for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007) (citing *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990)). Although the district court issued its decision in the context of a summary judgment motion, the court

dismissed Perich's claim based on a lack of subject matter jurisdiction and did not reach the merits of the claim. In addition, this Circuit has treated the "ministerial exception" as jurisdictional in nature and an appropriate ground for a motion to dismiss pursuant to Rule 12(b)(1). *See id. See also Rweyemamu v. Cote*, 520 F.3d 198, 206 (2d Cir. 2008) (noting that the circuits have taken different approaches in applying the ministerial exception, with the Third, Tenth, Ninth, and First Circuits treating the exception as an affirmative defense under Rule 12(b)(6),[2] the Sixth and Seventh Circuits interpreting the exception as jurisdictional under Rule 12(b)(1),[3] and the Eleventh and Fifth Circuits treating it as a mandate to interpret the discrimination laws not to apply to claims between ministers and their churches[4]). Accordingly, this Court should review the claim using the same analysis as it does for an order entered pursuant to Rule 12(b)(1).

In response to a Rule 12(b)(1) motion, the plaintiff bears the burden of proving jurisdiction. *Hollins*, 474 F.3d at 225. Furthermore, "unlike Rule 12(b)(6) analysis, under which the existence of genuine issues of material fact warrants denial of the motion to dismiss, 'the court is empowered to resolve factual disputes when subject matter jurisdiction is challenged.'" *Id.* (quoting *Moir*, 895 F.2d at 269). If the district court makes its jurisdictional ruling based on the resolution of both legal and factual disputes, this Court reviews the legal findings under a *de novo* standard and the factual findings under a clearly erroneous standard. *See Gordon v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005); *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1135 (6th Cir. 1996).

---

[2]*See, e.g., Petruska v. Gannon Univ.*, 462 F.3d 294, 302 (3d Cir. 2006); *Bryce v. Episcopal Church in the Diocese*, 289 F.3d 648, 654 (10th Cir. 2002); *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 951 (9th Cir. 1999); *Natal v. Christian & Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir. 1989).

[3]*See. e.g., Hollins*, 474 F.3d at 225; *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006).

[4]*See, e.g., Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1302-04 (11th Cir. 2000); *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972).

Perich argues that no facts relevant to the determination of subject matter jurisdiction were in dispute and, thus, this Court should review *de novo* all of the district court's findings. Hosanna-Tabor argues the district court made a number of factual findings in determining that the court had no subject matter jurisdiction, including Hosanna-Tabor's status as a "religious institution" and Perich's status as a "minister" and "ministerial employee." Thus, according to Hosanna-Tabor, this Court should review these factual findings under the clearly erroneous standard.

The district court made both factual and legal findings in determining whether the court had subject matter jurisdiction. The district court's determinations concerning Perich's primary duties throughout her work day were factual. Accordingly, this Court must accept these factual findings unless they are clearly erroneous. *See EEOC v. Sw. Baptist Theological Seminary*, 651 F.2d 277, 283 (5th Cir. 1981) (indicating that the district court's factual findings in support of its decision of which employees are ministers "must be accepted unless clearly erroneous"). However, its decision as to whether Perich classified as a ministerial employee remains a legal conclusion subject to *de novo* review. *See Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir. 1999) ("[t]he status of employees as ministers . . . remains a legal conclusion for this court").

## II. The ADA's Application to Religious Organizations

The ADA generally prohibits an employer with fifteen or more employees from discriminating against a qualified individual with a disability on the basis of that disability in regard to all conditions of employment. *See* 42 U.S.C. § 12111(5), § 12112(a). The retaliation provision of the ADA prohibits employers from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a).[5] Title I of the ADA includes an

---

[5]Perich also brought a claim under the PDCRA, a Michigan law which essentially tracks the ADA. Resolution of a plaintiff's ADA claim would generally resolve her PDCRA claim as well. *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 n.3 (6th Cir. 1998). In view of how closely the anti-retaliation provision of the PDCRA tracks the anti-retaliation provision of the ADA, resolving Perich's ADA claim also resolves her PDRCA claim.

exception–known as the "ministerial exception"–which allows religious entities to give "preference in employment to individuals of a particular religion" and to "require that all applicants and employees conform to the religious tenents of such organization." 42 U.S.C. § 12113(d).

However, the legislative history makes clear that Congress intended the ADA to broadly protect employees of religious entities from retaliation on the job, subject only to a narrowly drawn religious exemption. The House Report provides the following illustrative hypothetical example:

> [A]ssume that a Mormon organization wishes to hire only Mormons to perform certain jobs. If a person with a disability applies for the job, but is not a Mormon, the organization can refuse to hire him or her. However, if two Mormons apply for a job, one with a disability and one without a disability, the organization cannot discriminate against the applicant with the disability because of that person's disability.

H.R. Rep. No. 485 part 2, 101st Cong., 2d Sess. 76-77 (1990). *See also* 29 C.F.R. Pt. 1630, App. § 1630.16(a) ("Religious organizations are not exempt from title I of the ADA or [these regulations]. A religious [entity] may give a preference in employment to individuals of the particular religion, and may require that applicants and employees conform to the religious tenets of the organization. However, a religious organization may not discriminate against an individual who satisfies the permitted religious criteria because that individual is disabled. The religious entity, in other words, is required to consider qualified individuals with disabilities who satisfy the permitted religious criteria on an equal basis with qualified individuals without disabilities who similarly satisfy the religious criteria.").

## III. The Ministerial Exception

The ministerial exception is rooted in the First Amendment's guarantees of religious freedom. *Hollins*, 474 F.3d at 225.

### A.  Interference in Church Governance

As applied by this Circuit, the doctrine "precludes subject matter jurisdiction over claims involving the employment relationship between a religious institution and its ministerial employees, based on the institution's constitutional right to be free from judicial interference in the selection of those employees." *Id.  See generally Serbian E. Orthodox Diocese for the United States & Can. v. Milivojevic*, 426 U.S. 696, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); *Lewis v. Seventh Day Adventists Lake Region Conference*, 978 F.2d 940 (6th Cir. 1992).

As the Fifth Circuit noted in *McClure v. Salvation Army*, one of the first cases to analyze the ministerial exception, "[t]he relationship between an organized church and its ministers is its lifeblood.  The minister is the chief instrument by which the church seeks to fulfill its purpose."  460 F.2d at 558-59.  *See also Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167-68 (4th Cir. 1985) ("The right to choose ministers without government restriction underlies the well-being of religious community . . . for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrine both to its own membership and to the world at large.").

While the ministerial exception was first applied in the context of suits brought against religious employers under Title VII, *see McClure*, 460 F.2d at 560, the exception has been extended to suits brought against religious employers under the ADA.[6] *See, e.g., Hollins*, 474 F.3d at 225; *Werft v. Desert Sw. Annual Conference of United Methodist Church*, 377 F.3d 1099, 1100 (9th Cir. 2004); *Starkman*, 198 F.3d at 175.

For the ministerial exception to bar an employment discrimination claim, two factors must be present: (1) the employer must be a religious institution, and (2) the employee must be a ministerial employee.  *Hollins*, 474 F.3d at 225.

---

[6]Courts have also extended the ministerial exception to suits brought under the ADEA, the common law, and state law.  *See Hollins*, 474 F.3d at 225 (citing cases).

To qualify as a religious institution under the first prong, the employer need not be a traditional religious organization, such as a church, diocese, or synagogue, nor must it be an entity operated by a traditional religious organization. *Id.* Rather, a religiously affiliated entity is considered a religious institution if its "mission is marked by clear or obvious religious characteristics." *Id.* at 226 (citing *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 310 (4th Cir. 2004)). This Circuit has applied the ministerial exception to a religiously affiliated hospital, and it has explicitly approved of applying the doctrine to religiously affiliated schools and corporations. *Id.* at 225.

To determine whether an employee is ministerial under the second prong, this Circuit has instructed courts to look at the function, or "primary duties" of the employee.[7] *Id.* at 226 (applying the exception to a resident in a Methodist Hospital's clinical pastoral education program). As a general rule, an employee is considered a minister if "the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Id.* (quoting Bruce N. Bagni, *Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations*, 79 COLUM. L. REV. 1514, 1545 (1979)). *See also Rayburn*, 772 F.2d at 1169. In extending the ministerial exception beyond ordained ministers, this Circuit has instructed courts to look at the function of the plaintiff's employment position rather than the fact of ordination. *Hollins*, 474 F.3d at 226. Other circuits have further instructed that courts must "determine whether a position is important to the spiritual and pastoral mission of the church." *See, e.g., Rayburn*, 772 F.2d at 1169.

The parties in the instant case do not dispute that "religious institutions" include religiously affiliated schools and that Hosanna-Tabor meets this requirement. Thus, the

---

[7]At least one other circuit has found that this approach is too rigid, adopting a standard that considers both the employee's primary function and the nature of the dispute to determine whether analyzing the claim would entangle the court in religious doctrinal disputes. *Rweyemamu*, 520 F.3d at 208. However, this Circuit has adopted a standard that focuses on the primary duties of the employee to determine whether that employee should be classified as ministerial. *See Hollins*, 474 F.3d at 226.

first requirement under the ministerial exception is present, and the primary issue is whether Perich served as a ministerial employee.

The question of whether a teacher at a sectarian school classifies as a ministerial employee is one of first impression for this Court. However, the overwhelming majority of courts that have considered the issue have held that parochial school teachers such as Perich, who teach primarily secular subjects, do not classify as ministerial employees for purposes of the exception. *See, e.g., Redhead v. Conference of Seventh Day Adventists*, 440 F. Supp. 2d 211, 221-222 (E.D.N.Y. 2006) (holding that a teacher at a Seventh Day Adventist elementary school does not classify as a ministerial employee because her teaching duties were primarily secular and her daily religious duties "were limited to only one hour of Bible instruction per day"); *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42 F. Supp. 2d 849, 854 (S. D. Ind. 1998) (holding that a fifth grade teacher who taught at least one class in religion per term and organized Mass once a month at a religious elementary school was not a ministerial employee); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 172 (2d Cir. 1993) (holding that applying the ADEA to a math teacher at a religious high school would not result in excessive entanglement under the Establishment Clause); *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1392, 1397 (4th Cir. 1990) (holding that teachers at a religious school who integrated biblical material into traditional academic subjects should be considered lay teachers for purposes of the ministerial exception); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1370 (9th Cir. 1986) (holding that teachers at a church owned and operated school do not fulfill the function of a ministerial employee). *But see Clapper v. Chesapeake Conference of Seventh Day Adventists*, No. 97 CV 2648, 1998 WL 904528, at *1, 7 (Dec. 29, 1998) (holding that a former elementary school teacher at a school whose primary purpose was the salvation of each student's soul through indoctrination into Seventh Day Adventist theological beliefs classified as a ministerial employee).

By contrast, when courts have found that teachers classify as ministerial employees for purposes of the exception, those teachers have generally taught primarily religious subjects or had a central role in the spiritual or pastoral mission of the church.

*See, e.g., EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 463-65 (D.C. Cir. 1996) (holding that a nun whose primary duties were to teach canonical law at Catholic University and who was "entrusted with instructing students in the 'fundamental body of ecclesiastical laws' that governs the Church's sacramental life, defines the rights and duties of its faithful and the responsibilities of their pastors, and guides its administration" was a ministerial employee); *Sw. Baptist*, 651 F.2d at 283-84 (holding that seminary faculty were ministerial employees given that they served as "intermediaries between the [Baptist] Convention and the future ministers of many local Baptist churches," "instructed the seminarians in the 'whole of religious doctrine,' and [taught] only religious oriented courses").

The district court's factual determinations concerning Perich's primary duties throughout her work day were not clearly erroneous. The record supports the finding that Perich's employment duties were identical when she was a contract teacher and a called teacher and that she taught math, language arts, social studies, science, gym, art, and music using secular textbooks. Furthermore, the record indicates that Perich taught a religion class four days per week for thirty minutes and that she attended a chapel service with her class once a week for thirty minutes. Perich also led each class in prayer three times a day for a total of approximately five or six minutes. The record also indicates that Perich seldom introduced religion during secular discussions. Approximately twice a year, Perich led the chapel service in rotation with other teachers. However, teachers leading chapel or teaching religion were not required to be called or even Lutheran, and, in fact, at least one teacher was not. In all, the record supports the district court's finding that activities devoted to religion consumed approximately forty-five minutes of the seven hour school day.

However, given these factual findings relating to Perich's primary duties, the district court erred in its legal conclusion classifying Perich as a ministerial employee. Perich spent approximately six hours and fifteen minutes of her seven hour day teaching secular subjects, using secular textbooks, without incorporating religion into the secular material. *Cf. Clapper*, 1998 WL 904528, at *2 (finding that an elementary school

teacher's primary duties were religious where he taught the Bible's story of creation in science class and the influence of religion on the events of history in social studies class). Thus, it is clear that Perich's primary function was teaching secular subjects, not "spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Hollins*, 474 F.3d at 226. (internal citation omitted) *See also EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) ("The College's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine.").

The fact that Perich participated in and led some religious activities throughout the day does not make her primary function religious. *See Guinan*, 42 F. Supp. 2d at 852 (finding that although the teacher did participate in some religious activities, "it cannot be fairly said that she functioned as a minister or a member of the clergy"). This is underscored by the fact that teachers were not required to be called or even Lutheran to conduct these religious activities, and at least one teacher at Hosanna-Tabor was not Lutheran. *See* at 852-53 ("the secular nature of [the teacher's] position is underscored by the fact that [the church] did not require teachers at [the school] to be Catholic, and, as a matter of fact, some were not Catholic").

In addition, that Hosanna-Tabor has a generally religious character–as do all religious schools by definition–and characterizes its staff members as "fine Christian role models" does not transform Perich's primary responsibilities in the classroom into religious activities. *See Miss. Coll.*, 626 F.2d at 485 ("That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern."). This is underscored by the fact that Perich can only recall twice in her career when she introduced the topic of religion during secular discussions.[8]

---

[8]While Defendant cites a quote from Perich in which she says that the educational ministry is special "because the teacher can bring God into every subject," the record supports the district court's finding that only twice did Perich bring religion into otherwise secular subjects.

*Cf. Clapper*, 1998 WL 904528, at *7 (finding that an elementary school teacher's primary duties were religious where the academic curriculum in traditionally secular subjects "incorporate[d] the teachings of the Seventh-day Adventist Church whenever possible"). Similarly, Perich's extra religious training as a result of completing her colloquy did not affect the duties she performed in the classroom on a daily basis. *See Guinan*, 42 F. Supp. 2d at 850 (finding that a teacher whose training as a Catechist permitted her to teach religion classes was not a ministerial employee).

In finding that Perich was a ministerial employee, the district court relied largely on the fact that Hosanna-Tabor gave Perich the title of commissioned minister and held her out to the world as a minister by bestowing this title upon her. However, the *title* of commissioned minister does not transform the *primary duties* of these called teachers from secular in nature to religious in nature. *See Sw. Baptist*, 651 F.2d at 285 (holding that certain employees, "though considered ministers by the Seminary, are not ministers" under the ministerial exception). The governing primary duties analysis requires a court to objectively examine an employee's actual job function, not her title, in determining whether she is properly classified as a minister. In this case, it is clear from the record that Perich's primary duties were secular, not only because she spent the overwhelming majority of her day teaching secular subjects using secular textbooks, but also because nothing in the record indicates that the Lutheran church relied on Perich as the primary means to indoctrinate its faithful into its theology. *See Clapper*, 1998 WL 904528, at *7 (warning that courts should examine not only the relative quantity of time an employee spends on religious versus secular activities, but also "the degree of the church entity's reliance upon such employee to indoctrinate persons into its theology"). By contrast, in *Clapper*, the defendant schools envisioned their teachers as having a primarily religious role. The teachers were required to be "tithe paying members of the Seventh-day Adventist Church and are expected to participate in church activities, programs, and finances." *See Clapper*, 1998 WL 904528, at *2. The Fourth Circuit observed that "[t]he purpose of this requirement is obvious–the Chesapeake Conference

desires to insure that the minds of its youth are shaped by model members of the Seventh-day Adventist faith." *Id.* at \*7.

Furthermore, the district court in the instant case found that the primary duties of called teachers are identical to those of contract teachers, who do not have the title of minister, and at least one contract teacher who taught at the school was not Lutheran. Given the undisputed evidence that all teachers at Hosanna-Tabor were assigned the same duties, a finding that Perich is a "ministerial" employee would compel the conclusion that all teachers at the school–called, contract, Lutheran, and non-Lutheran–are similarly excluded from coverage under the ADA and other federal fair employment laws. However, the intent of the ministerial exception is to allow religious organizations to prefer members of their own religion and adhere to their own religious interpretations. Thus, applying the exception to non-members of the religion and those whose primary function is not religious in nature would be both illogical and contrary to the intention behind the exception.

**B. Interpretation of Church Doctrine**

In addition to being motivated by the concern of government interference in church governance, the ministerial exception is also motivated by the concern "that secular authorities would be involved in evaluating or interpreting religious doctrine." *Tomic,* 442 F.3d at 1039 (quoting *Combs v. Central Texas Annual Conference of United Methodist Church*, 173 F.3d 343, 350 (5th Cir. 1999)).

In the instant case, Hosanna-Tabor has attempted to reframe the underlying dispute from the question of whether Hosanna-Tabor fired Perich in violation of the ADA to the question of whether Perich violated church doctrine by not engaging in internal dispute resolution. However, contrary to Hosanna-Tabor's assertions, Perich's claim would not require the court to analyze any church doctrine; rather a trial would focus on issues such as whether Perich was disabled within the meaning of the ADA, whether Perich opposed a practice that was unlawful under the ADA, and whether Hosanna-Tabor violated the ADA in its treatment of Perich. As Plaintiff notes, the

LCMS personnel manual, which includes EEOC policy, and the Governing Manual for Lutheran Schools clearly contemplate that teachers are protected by employment discrimination and contract laws.  In addition, none of the letters that Hosanna-Tabor sent to Perich throughout her termination process reference church doctrine or the LCMS dispute resolution procedures.

Furthermore, this Court would not be precluded from inquiring into whether a doctrinal basis actually motivated Hosanna-Tabor's actions.  *See, e.g., Geary v. Visitation of Blessed Virgin Mary Parish Sch.*, 7 F.3d 324, 329 (3d Cir. 1993) (finding that the First Amendment did not preclude the court from "determin[ing] whether the religious reason stated by [the school] actually motivated the dismissal"); *DeMarco*, 4 F.3d at 171 (noting that a court can conduct an "inquiry . . . directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action" without "calling into question the value or truthfulness of religious doctrine").

## CONCLUSION

Because the ministerial exception does not bar Perich's claims against Hosanna-Tabor, we **VACATE** the district court's order entering summary judgment on behalf of Defendant and **REMAND** with instructions that the district court make a finding on the merits of Perich's retaliation claim under the ADA.

---

### CONCURRENCE

---

HELENE N. WHITE, Circuit Judge, concurring.  I agree that the ministerial exception[1] does not bar this ADA action.  I write separately because I read the relevant cases as more evenly split than does the majority.

As the majority notes, whether a teacher at a sectarian school is properly characterized as a ministerial employee is an issue of first impression for this Court.[2] A number of courts have concluded that parochial school teachers are not ministerial employees for purposes of the exception.  *See, e.g., DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 171-72 (2d Cir. 1993); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1370 (9th Cir. 1986); *Redhead v. Conf. of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 221-22 (E.D.N.Y. 2006); *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42 F. Supp. 2d 849, 852-54 (S.D. Ind. 1998); *see also Dole v. Shenandoah Baptist Church*,

---

[1] It is worth clarifying that "the ministerial exception" is fundamentally distinct from the statutory exceptions in federal antidiscrimination laws like the ADA and Title VII.  *See* Douglas Laycock, *A Syllabus of Errors*, 105 Mich. L. Rev. 1169, 1181-82 (2007) (book review).  The statutory exception to the ADA allows religious entities to "giv[e] preference in employment to individuals of a particular religion" and to "require that all applicants and employees conform" to the organization's religious tenets. 42 U.S.C. § 12113(d).  The statutory exception only covers religious discrimination, but it applies to any employee of a religious entity.  *See* Laycock at 1182.  In contrast, the ministerial exception is a separate judge-made exception rooted in the First Amendment designed to allow religious organizations to hire and fire religious leaders according to  any criteria they choose.  *See id.* at 1181; *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007).  The ministerial exception is broad – it covers any kind of discrimination – but applies only to religious leaders, or those whose duties are "ministerial."  *See* Laycock at 1182.

[2] Courts have struggled in determining the proper application of the ministerial exception to teachers at religious schools.  A student note points out that application of the primary-duties test has created split authority in several areas, including  regarding parochial school teachers.  *See* Note, *The Ministerial Exception to Title VII:  The Case for a Deferential Primary Duties Test*, 121 Harv. L. Rev. 1776, 1788 (2008).  And several courts have recognized the lack of uniformity in this area.  *See Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008) ("Circuit courts applying the ministerial exception have consistently struggled to decide whether or not a particular employee is functionally a 'minister.'"); *Coulee Catholic Sch. v. Labor and Indus. Rev. Comm.*, 768 N.W.2d 868, 881 (Wis. 2009) (explaining contrasting ways in which courts have interpreted primary-duties test); *Weishuhn v. Catholic Diocese of Lansing*, 756 N.W.2d 483, 492-93 (Mich. App. 2008) (listing cases in which ministerial exception has been applied to teachers, and cases in which it has not).  *See also* Petition for Writ of Certiorari, *Archdiocese of Washington v. Moersen*, 128 S. Ct. 1217, 2007 WL 2681957 at *15 (No. 07-0323) (Sept. 7, 2007) ("teachers at church-related schools have been included within the ministerial exception by some courts and excluded by others").  The Supreme Court has declined to weigh in on the issue.  *See Moersen*, 128 S. Ct. 1217 (2008) (mem.); *The Ministerial Exception*, *supra*, at 1776 n.3 (noting certiorari denials in 2006 and 2007).

899 F.2d 1389, 1396-97 (4th Cir. 1990).[3] In contrast, courts have found teachers to be ministerial employees where the teachers have taught religious subjects and/or had a key role in the religious mission of the church. *See Clapper v. Chesapeake Conference of Seventh Day Adventists*, 166 F.3d 1208, 1998 WL 904528, at *1, 7 (4th Cir. Dec. 29, 1998) (unpublished); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 463-65 (D.C. Cir. 1996); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 283-84 (5th Cir. 1981); *Coulee Catholic Sch. v. Labor and Indus. Rev. Comm.*, 768 N.W.2d 868 (Wis. 2009).

Of these cases, four present situations similar to that here — plaintiff teachers who taught primarily secular subjects at a religious school and court decisions turning on a primary-duties analysis. Two plaintiffs were not found to be ministerial employees. *See Redhead*, 440 F. Supp. 2d at 221-22 (teacher at Seventh-day Adventist elementary school teaching secular subjects and daily Bible study not a ministerial employee because teaching duties were "primarily secular" and religious duties "were limited to only one hour of Bible instruction per day and attending religious ceremonies with students only once per year"); *Guinan*, 42 F. Supp. 2d at 852-53 (fifth-grade teacher teaching mostly secular courses along with one class in religion and organized Mass once a month not a ministerial employee; secular nature of the teaching position demonstrated by the fact that some teachers were not Catholic). Two plaintiffs were found to be ministerial employees. *See Clapper*, 1998 WL 904528, at *1, *7 (elementary school teacher teaching traditional academic curriculum who also led students in prayer and taught the Bible on a daily basis is a ministerial employee; court rejected argument that only one of teacher's thirteen responsibilities was explicitly religious, relying on the fact that the church's code made clear that the "the primary purpose of the Seventh-day Adventist elementary education" is the redemption of students' souls through belief in and adherence to Seventh-day Adventist beliefs);

---

[3]The majority cites *Dole* for the original proposition that parochial school teachers are not ministerial employees for purposes of the ministerial exception. However, *Dole* addresses whether a specific statutory exception applies. *See id*. at 1396-97. (evaluating whether teachers are ministers for purposes of statutory exception from the definition of "employees" in the Fair Labor Standards Act).

*Coulee*, 768 N.W.2d at 881-82 (in applying primary-duties test, state supreme court eschewed quantitative analysis of time spent on tasks in favor of functional approach focusing on whether organization has a fundamentally religious mission and how important or closely tied the employee's work is to the fundamental mission, concluding plaintiff's teaching Catholic doctrine and practice to students four days a week occupied a role "of high importance and closely linked to the mission of the school – the inculcation of a Christ-centered concept of life.").

Perich's daily duties resemble to some extent those of the plaintiffs in each of these cases, including those in which the courts found the plaintiffs' "primary duties" to be ministerial in nature. Tipping the scale against the ministerial exception in this case is that, as the majority points out, there is evidence here that *the school itself* did not envision its teachers as religious leaders, or as occupying "ministerial" roles. Hosanna-Tabor's teachers are not required to be called or even Lutheran to teach or to lead daily religious activities. The fact that the duties of the contract teachers are the same as the duties of the called teachers is telling. This presence (or lack) of a predominantly religious yardstick for qualification as a teacher is a key factor in decisions finding the ministerial exception applicable and those finding it inapplicable alike. *See Clapper*, 1998 WL 904528 at *2, *7 (4th Cir. 1998) (applying ministerial exception) (noting that teachers are required to be "tithe paying members of the Seventh-day Adventist Church and are expected to participate in church activities, programs, and finances" and "The purpose of this requirement is obvious-the Chesapeake Conference desires to insure that the minds of its youth are shaped by model members of the Seventh-day Adventist faith."); *Coulee*, 768 N.W.2d at 891 (applying ministerial exception) (court found that the plaintiff teacher was "required to live, embody, and teach Catholicism in her role as a teacher consistent with the mission of the school" where teacher was required to "engage in Catholic worship, model Catholic living, and impart Catholic teaching," even though not required to be a Catholic); *Guinan*, 42 F. Supp. 2d at 852-53 (S.D. Ind. 1998) (ministerial exception does not apply) ("the secular nature of [the teacher's] position is

underscored by the fact that the Archdiocese did not require teachers at [the school] to be Catholic and, as a matter of fact, some were not Catholic.")

By this measure, even courts that have found ministerial plaintiffs who have daily schedules that have roughly the same ratio of religious to non-religious activities as Perich would find that the ministerial exception should not apply here.

For the reasons above, I concur.