(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HOSANNA-TABOR EVANGELICAL LUTHERAN CHURCH AND SCHOOL *v.* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 10–553.  Argued October 5, 2011—Decided January 11, 2012

Petitioner Hosanna-Tabor Evangelical Lutheran Church and School is a member congregation of the Lutheran Church–Missouri Synod. The Synod classifies its school teachers into two categories: "called" and "lay."  "Called" teachers are regarded as having been called to their vocation by God.  To be eligible to be considered "called," a teacher must complete certain academic requirements, including a course of theological study.  Once called, a teacher receives the formal title "Minister of Religion, Commissioned."  "Lay" teachers, by contrast, are not required to be trained by the Synod or even to be Lutheran.  Although lay and called teachers at Hosanna-Tabor generally performed the same duties, lay teachers were hired only when called teachers were unavailable.

   After respondent Cheryl Perich completed the required training, Hosanna-Tabor asked her to become a called teacher.  Perich accepted the call and was designated a commissioned minister.  In addition to teaching secular subjects, Perich taught a religion class, led her students in daily prayer and devotional exercises, and took her students to a weekly school-wide chapel service.  Perich led the chapel service herself about twice a year.

   Perich developed narcolepsy and began the 2004–2005 school year on disability leave.  In January 2005, she notified the school principal that she would be able to report to work in February.  The principal responded that the school had already contracted with a lay teacher to fill Perich's position for the remainder of the school year.  The principal also expressed concern that Perich was not yet ready to return to the classroom.  The congregation subsequently offered to pay

a portion of Perich's health insurance premiums in exchange for her resignation as a called teacher. Perich refused to resign. In February, Perich presented herself at the school and refused to leave until she received written documentation that she had reported to work. The principal later called Perich and told her that she would likely be fired. Perich responded that she had spoken with an attorney and intended to assert her legal rights. In a subsequent letter, the chairman of the school board advised Perich that the congregation would consider whether to rescind her call at its next meeting. As grounds for termination, the letter cited Perich's "insubordination and disruptive behavior," as well as the damage she had done to her "working relationship" with the school by "threatening to take legal action." The congregation voted to rescind Perich's call, and Hosanna-Tabor sent her a letter of termination.

Perich filed a charge with the Equal Employment Opportunity Commission, claiming that her employment had been terminated in violation of the Americans with Disabilities Act. The EEOC brought suit against Hosanna-Tabor, alleging that Perich had been fired in retaliation for threatening to file an ADA lawsuit. Perich intervened in the litigation. Invoking what is known as the "ministerial exception," Hosanna-Tabor argued that the suit was barred by the First Amendment because the claims concerned the employment relationship between a religious institution and one of its ministers. The District Court agreed and granted summary judgment in Hosanna-Tabor's favor. The Sixth Circuit vacated and remanded. It recognized the existence of a ministerial exception rooted in the First Amendment, but concluded that Perich did not qualify as a "minister" under the exception.

*Held*:

1. The Establishment and Free Exercise Clauses of the First Amendment bar suits brought on behalf of ministers against their churches, claiming termination in violation of employment discrimination laws. Pp. 6–15.

  (a) The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Familiar with life under the established Church of England, the founding generation sought to foreclose the possibility of a national church. By forbidding the "establishment of religion" and guaranteeing the "free exercise thereof," the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices. Pp. 6–10.

  (b) This Court first considered the issue of government interference with a church's ability to select its own ministers in the context

of disputes over church property. This Court's decisions in that area confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers. See *Watson* v. *Jones*, 13 Wall. 679; *Kedroff* v. *Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U. S. 94; *Serbian Eastern Orthodox Diocese for United States and Canada* v. *Milivojevich*, 426 U. S. 696. Pp. 10–12.

(c) Since the passage of Title VII of the Civil Rights Act of 1964 and other employment discrimination laws, the Courts of Appeals have uniformly recognized the existence of a "ministerial exception," grounded in the First Amendment, that precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers. The Court agrees that there is such a ministerial exception. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

The EEOC and Perich contend that religious organizations can defend against employment discrimination claims by invoking their First Amendment right to freedom of association. They thus see no need—and no basis—for a special rule for ministers grounded in the Religion Clauses themselves. Their position, however, is hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations. The Court cannot accept the remarkable view that the Religion Clauses have nothing to say about a religious organization's freedom to select its own ministers.

The EEOC and Perich also contend that *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, precludes recognition of a ministerial exception. But *Smith* involved government regulation of only outward physical acts. The present case, in contrast, concerns government interference with an internal church decision that affects the faith and mission of the church itself. Pp. 13–15.

2. Because Perich was a minister within the meaning of the ministerial exception, the First Amendment requires dismissal of this employment discrimination suit against her religious employer. Pp. 15–21.

(a) The ministerial exception is not limited to the head of a religious congregation. The Court, however, does not adopt a rigid formula for deciding when an employee qualifies as a minister. Here, it is enough to conclude that the exception covers Perich, given all the circumstances of her employment. Hosanna-Tabor held her out as a minister, with a role distinct from that of most of its members. That title represented a significant degree of religious training followed by a formal process of commissioning. Perich also held herself out as a minister by, for example, accepting the formal call to religious service. And her job duties reflected a role in conveying the Church's message and carrying out its mission: As a source of religious instruction, Perich played an important part in transmitting the Lutheran faith.

In concluding that Perich was not a minister under the exception, the Sixth Circuit committed three errors. First, it failed to see any relevance in the fact that Perich was a commissioned minister. Although such a title, by itself, does not automatically ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant, as is the fact that significant religious training and a recognized religious mission underlie the description of the employee's position. Second, the Sixth Circuit gave too much weight to the fact that lay teachers at the school performed the same religious duties as Perich. Though relevant, it cannot be dispositive that others not formally recognized as ministers by the church perform the same functions—particularly when, as here, they did so only because commissioned ministers were unavailable. Third, the Sixth Circuit placed too much emphasis on Perich's performance of secular duties. Although the amount of time an employee spends on particular activities is relevant in assessing that employee's status, that factor cannot be considered in isolation, without regard to the other considerations discussed above. Pp. 15–19.

(b) Because Perich was a minister for purposes of the exception, this suit must be dismissed. An order reinstating Perich as a called teacher would have plainly violated the Church's freedom under the Religion Clauses to select its own ministers. Though Perich no longer seeks reinstatement, she continues to seek frontpay, backpay, compensatory and punitive damages, and attorney's fees. An award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination. Such relief would depend on a determination that Hosanna-Tabor was wrong to have relieved Perich of her position, and it is precisely such a ruling that is barred by the ministerial exception.

Any suggestion that Hosanna-Tabor's asserted religious reason for

Syllabus

firing Perich was pretextual misses the point of the ministerial exception. The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful is the church's alone. Pp. 19–20.

(c) Today the Court holds only that the ministerial exception bars an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. The Court expresses no view on whether the exception bars other types of suits. Pp. 20–21.

597 F. 3d 769, reversed.

ROBERTS, C. J., delivered the opinion for a unanimous Court. THOMAS, J., filed a concurring opinion. ALITO, J., filed a concurring opinion, in which KAGAN, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–553

## HOSANNA-TABOR EVANGELICAL LUTHERAN CHURCH AND SCHOOL, PETITIONER *v.* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[January 11, 2012]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Certain employment discrimination laws authorize employees who have been wrongfully terminated to sue their employers for reinstatement and damages. The question presented is whether the Establishment and Free Exercise Clauses of the First Amendment bar such an action when the employer is a religious group and the employee is one of the group's ministers.

I

A

Petitioner Hosanna-Tabor Evangelical Lutheran Church and School is a member congregation of the Lutheran Church–Missouri Synod, the second largest Lutheran denomination in America. Hosanna-Tabor operated a small school in Redford, Michigan, offering a "Christ-centered education" to students in kindergarten through eighth grade. 582 F. Supp. 2d 881, 884 (ED Mich. 2008) (internal quotation marks omitted).

The Synod classifies teachers into two categories: "called" and "lay." "Called" teachers are regarded as having been called to their vocation by God through a congregation. To be eligible to receive a call from a congregation, a teacher must satisfy certain academic requirements. One way of doing so is by completing a "colloquy" program at a Lutheran college or university. The program requires candidates to take eight courses of theological study, obtain the endorsement of their local Synod district, and pass an oral examination by a faculty committee. A teacher who meets these requirements may be called by a congregation. Once called, a teacher receives the formal title "Minister of Religion, Commissioned." App. 42, 48. A commissioned minister serves for an open-ended term; at Hosanna-Tabor, a call could be rescinded only for cause and by a supermajority vote of the congregation.

"Lay" or "contract" teachers, by contrast, are not required to be trained by the Synod or even to be Lutheran. At Hosanna-Tabor, they were appointed by the school board, without a vote of the congregation, to one-year renewable terms. Although teachers at the school generally performed the same duties regardless of whether they were lay or called, lay teachers were hired only when called teachers were unavailable.

Respondent Cheryl Perich was first employed by Hosanna-Tabor as a lay teacher in 1999. After Perich completed her colloquy later that school year, Hosanna-Tabor asked her to become a called teacher. Perich accepted the call and received a "diploma of vocation" designating her a commissioned minister. *Id.,* at 42.

Perich taught kindergarten during her first four years at Hosanna-Tabor and fourth grade during the 2003–2004 school year. She taught math, language arts, social studies, science, gym, art, and music. She also taught a religion class four days a week, led the students in prayer and

devotional exercises each day, and attended a weekly school-wide chapel service. Perich led the chapel service herself about twice a year.

Perich became ill in June 2004 with what was eventually diagnosed as narcolepsy. Symptoms included sudden and deep sleeps from which she could not be roused. Because of her illness, Perich began the 2004–2005 school year on disability leave. On January 27, 2005, however, Perich notified the school principal, Stacey Hoeft, that she would be able to report to work the following month. Hoeft responded that the school had already contracted with a lay teacher to fill Perich's position for the remainder of the school year. Hoeft also expressed concern that Perich was not yet ready to return to the classroom.

On January 30, Hosanna-Tabor held a meeting of its congregation at which school administrators stated that Perich was unlikely to be physically capable of returning to work that school year or the next. The congregation voted to offer Perich a "peaceful release" from her call, whereby the congregation would pay a portion of her health insurance premiums in exchange for her resignation as a called teacher. *Id.,* at 178, 186. Perich refused to resign and produced a note from her doctor stating that she would be able to return to work on February 22. The school board urged Perich to reconsider, informing her that the school no longer had a position for her, but Perich stood by her decision not to resign.

On the morning of February 22—the first day she was medically cleared to return to work—Perich presented herself at the school. Hoeft asked her to leave but she would not do so until she obtained written documentation that she had reported to work. Later that afternoon, Hoeft called Perich at home and told her that she would likely be fired. Perich responded that she had spoken with an attorney and intended to assert her legal rights.

Following a school board meeting that evening, board

chairman Scott Salo sent Perich a letter stating that Hosanna-Tabor was reviewing the process for rescinding her call in light of her "regrettable" actions. *Id.,* at 229. Salo subsequently followed up with a letter advising Perich that the congregation would consider whether to rescind her call at its next meeting. As grounds for termination, the letter cited Perich's "insubordination and disruptive behavior" on February 22, as well as the damage she had done to her "working relationship" with the school by "threatening to take legal action." *Id.,* at 55. The congregation voted to rescind Perich's call on April 10, and Hosanna-Tabor sent her a letter of termination the next day.

B

Perich filed a charge with the Equal Employment Opportunity Commission, alleging that her employment had been terminated in violation of the Americans with Disabilities Act, 104 Stat. 327, 42 U. S. C. §12101 *et seq.* (1990). The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability. §12112(a). It also prohibits an employer from retaliating "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." §12203(a).[1]

––––––––––

[1] The ADA itself provides religious entities with two defenses to claims of discrimination that arise under subchapter I of the Act. The first provides that "[t]his subchapter shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to individuals of a particular religion to perform work connected with the carrying on by such [entity] of its activities." §12113(d)(1) (2006 ed., Supp. III). The second provides that "[u]nder this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of such organization." §12113(d)(2). The ADA's prohibition against retaliation,

The EEOC brought suit against Hosanna-Tabor, alleging that Perich had been fired in retaliation for threatening to file an ADA lawsuit. Perich intervened in the litigation, claiming unlawful retaliation under both the ADA and the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws §37.1602(a) (1979). The EEOC and Perich sought Perich's reinstatement to her former position (or frontpay in lieu thereof), along with backpay, compensatory and punitive damages, attorney's fees, and other injunctive relief.

Hosanna-Tabor moved for summary judgment. Invoking what is known as the "ministerial exception," the Church argued that the suit was barred by the First Amendment because the claims at issue concerned the employment relationship between a religious institution and one of its ministers. According to the Church, Perich was a minister, and she had been fired for a religious reason—namely, that her threat to sue the Church violated the Synod's belief that Christians should resolve their disputes internally.

The District Court agreed that the suit was barred by the ministerial exception and granted summary judgment in Hosanna-Tabor's favor. The court explained that "Hosanna-Tabor treated Perich like a minister and held her out to the world as such long before this litigation began," and that the "facts surrounding Perich's employment in a religious school with a sectarian mission" supported the Church's characterization. 582 F. Supp. 2d, at 891–892. In light of that determination, the court concluded that it could "inquire no further into her claims of retaliation." *Id.,* at 892.

The Court of Appeals for the Sixth Circuit vacated and

_____

§12203(a), appears in a different subchapter—subchapter IV. The EEOC and Perich contend, and Hosanna-Tabor does not dispute, that these defenses therefore do not apply to retaliation claims.

remanded, directing the District Court to proceed to the merits of Perich's retaliation claims. The Court of Appeals recognized the existence of a ministerial exception barring certain employment discrimination claims against religious institutions—an exception "rooted in the First Amendment's guarantees of religious freedom." 597 F. 3d 769, 777 (2010). The court concluded, however, that Perich did not qualify as a "minister" under the exception, noting in particular that her duties as a called teacher were identical to her duties as a lay teacher. *Id.,* at 778–781. Judge White concurred. She viewed the question whether Perich qualified as a minister to be closer than did the majority, but agreed that the "fact that the duties of the contract teachers are the same as the duties of the called teachers is telling." *Id.,* at 782, 784.

We granted certiorari. 563 U. S. ___ (2011).

## II

The First Amendment provides, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." We have said that these two Clauses "often exert conflicting pressures," *Cutter* v. *Wilkinson*, 544 U. S. 709, 719 (2005), and that there can be "internal tension . . . between the Establishment Clause and the Free Exercise Clause," *Tilton* v. *Richardson*, 403 U. S. 672, 677 (1971) (plurality opinion). Not so here. Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers.

## A

Controversy between church and state over religious offices is hardly new. In 1215, the issue was addressed in the very first clause of Magna Carta. There, King John agreed that "the English church shall be free, and shall have its rights undiminished and its liberties unimpaired."

The King in particular accepted the "freedom of elections," a right "thought to be of the greatest necessity and importance to the English church." J. Holt, Magna Carta App. IV, p. 317, cl. 1 (1965).

That freedom in many cases may have been more theoretical than real. See, *e.g.*, W. Warren, Henry II 312 (1973) (recounting the writ sent by Henry II to the electors of a bishopric in Winchester, stating: "I order you to hold a free election, but forbid you to elect anyone but Richard my clerk"). In any event, it did not survive the reign of Henry VIII, even in theory. The Act of Supremacy of 1534, 26 Hen. 8, ch. 1, made the English monarch the supreme head of the Church, and the Act in Restraint of Annates, 25 Hen. 8, ch. 20, passed that same year, gave him the authority to appoint the Church's high officials. See G. Elton, The Tudor Constitution: Documents and Commentary 331–332 (1960). Various Acts of Uniformity, enacted subsequently, tightened further the government's grip on the exercise of religion. See, *e.g.*, Act of Uniformity, 1559, 1 Eliz., ch. 2; Act of Uniformity, 1549, 2 & 3 Edw. 6, ch. 1. The Uniformity Act of 1662, for instance, limited service as a minister to those who formally assented to prescribed tenets and pledged to follow the mode of worship set forth in the Book of Common Prayer. Any minister who refused to make that pledge was "deprived of all his Spiritual Promotions." Act of Uniformity, 1662, 14 Car. 2, ch. 4.

Seeking to escape the control of the national church, the Puritans fled to New England, where they hoped to elect their own ministers and establish their own modes of worship. See T. Curry, The First Freedoms: Church and State in America to the Passage of the First Amendment 3 (1986); McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1422 (1990). William Penn, the Quaker proprietor of what would eventually become Pennsylvania and Delaware, also sought independence from the Church of Eng-

land.  The charter creating the province of Pennsylvania contained no clause establishing a religion.  See S. Cobb, The Rise of Religious Liberty in America 440–441 (1970).

Colonists in the South, in contrast, brought the Church of England with them.  But even they sometimes chafed at the control exercised by the Crown and its representatives over religious offices.  In Virginia, for example, the law vested the governor with the power to induct ministers presented to him by parish vestries, 2 Hening's Statutes at Large 46 (1642), but the vestries often refused to make such presentations and instead chose ministers on their own.  See H. Eckenrode, Separation of Church and State in Virginia 13–19 (1910).  Controversies over the selection of ministers also arose in other Colonies with Anglican establishments, including North Carolina.  See C. Antieau, A. Downey, & E. Roberts, Freedom from Federal Establishment: Formation and Early History of the First Amendment Religion Clauses 10–11 (1964).  There, the royal governor insisted that the right of presentation lay with the Bishop of London, but the colonial assembly enacted laws placing that right in the vestries.  Authorities in England intervened, repealing those laws as inconsistent with the rights of the Crown.  See *id.,* at 11; Weeks, Church and State in North Carolina, Johns Hopkins U. Studies in Hist. & Pol. Sci., 11th Ser., Nos. 5–6, pp. 29–36 (1893).

It was against this background that the First Amendment was adopted.  Familiar with life under the established Church of England, the founding generation sought to foreclose the possibility of a national church.  See 1 Annals of Cong. 730–731 (1789) (noting that the Establishment Clause addressed the fear that "one sect might obtain a pre-eminence, or two combine together, and establish a religion to which they would compel others to conform" (remarks of J. Madison)).  By forbidding the "establishment of religion" and guaranteeing the "free

exercise thereof," the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices. The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own.

This understanding of the Religion Clauses was reflected in two events involving James Madison, "'the leading architect of the religion clauses of the First Amendment.'" *Arizona Christian School Tuition Organization* v. *Winn*, 563 U. S. ___, ___ (2011) (slip op., at 13) (quoting *Flast* v. *Cohen*, 392 U. S. 83, 103 (1968)). The first occurred in 1806, when John Carroll, the first Catholic bishop in the United States, solicited the Executive's opinion on who should be appointed to direct the affairs of the Catholic Church in the territory newly acquired by the Louisiana Purchase. After consulting with President Jefferson, then-Secretary of State Madison responded that the selection of church "functionaries" was an "entirely ecclesiastical" matter left to the Church's own judgment. Letter from James Madison to Bishop Carroll (Nov. 20, 1806), reprinted in 20 Records of the American Catholic Historical Society 63 (1909). The "scrupulous policy of the Constitution in guarding against a political interference with religious affairs," Madison explained, prevented the Government from rendering an opinion on the "selection of ecclesiastical individuals." *Id.,* at 63–64.

The second episode occurred in 1811, when Madison was President. Congress had passed a bill incorporating the Protestant Episcopal Church in the town of Alexandria in what was then the District of Columbia. Madison vetoed the bill, on the ground that it "exceeds the rightful authority to which Governments are limited, by the essential distinction between civil and religious functions, and violates, in particular, the article of the Constitution of the

United States, which declares, that 'Congress shall make no law respecting a religious establishment.'" 22 Annals of Cong. 982–983 (1811). Madison explained:

> "The bill enacts into, and establishes by law, sundry rules and proceedings relative purely to the organization and polity of the church incorporated, *and comprehending even the election and removal of the Minister of the same*; so that no change could be made therein by the particular society, or by the general church of which it is a member, and whose authority it recognises." *Id.,* at 983 (emphasis added).

## B

Given this understanding of the Religion Clauses—and the absence of government employment regulation generally—it was some time before questions about government interference with a church's ability to select its own ministers came before the courts. This Court touched upon the issue indirectly, however, in the context of disputes over church property. Our decisions in that area confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers.

In *Watson* v. *Jones*, 13 Wall. 679 (1872), the Court considered a dispute between antislavery and proslavery factions over who controlled the property of the Walnut Street Presbyterian Church in Louisville, Kentucky. The General Assembly of the Presbyterian Church had recognized the antislavery faction, and this Court—applying not the Constitution but a "broad and sound view of the relations of church and state under our system of laws"—declined to question that determination. *Id.,* at 727. We explained that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them."

*Ibid.* As we would put it later, our opinion in *Watson* "radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff* v. *Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U. S. 94, 116 (1952).

Confronting the issue under the Constitution for the first time in *Kedroff*, the Court recognized that the "[f]reedom to select the clergy, where no improper methods of choice are proven," is "part of the free exercise of religion" protected by the First Amendment against government interference. *Ibid.* At issue in *Kedroff* was the right to use a Russian Orthodox cathedral in New York City. The Russian Orthodox churches in North America had split from the Supreme Church Authority in Moscow, out of concern that the Authority had become a tool of the Soviet Government. The North American churches claimed that the right to use the cathedral belonged to an archbishop elected by them; the Supreme Church Authority claimed that it belonged instead to an archbishop appointed by the patriarch in Moscow. New York's highest court ruled in favor of the North American churches, based on a state law requiring every Russian Orthodox church in New York to recognize the determination of the governing body of the North American churches as authoritative. *Id.,* at 96–97, 99, n. 3, 107, n. 10.

This Court reversed, concluding that the New York law violated the First Amendment. *Id.,* at 107. We explained that the controversy over the right to use the cathedral was "strictly a matter of ecclesiastical government, the power of the Supreme Church Authority of the Russian Orthodox Church to appoint the ruling hierarch of the archdiocese of North America." *Id.,* at 115. By "pass[ing] the control of matters strictly ecclesiastical from one

church authority to another," the New York law intruded the "power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment." *Id.,* at 119. Accordingly, we declared the law unconstitutional because it "directly prohibit[ed] the free exercise of an ecclesiastical right, the Church's choice of its hierarchy." *Ibid.*

This Court reaffirmed these First Amendment principles in *Serbian Eastern Orthodox Diocese for United States and Canada* v. *Milivojevich*, 426 U. S. 696 (1976), a case involving a dispute over control of the American-Canadian Diocese of the Serbian Orthodox Church, including its property and assets. The Church had removed Dionisije Milivojevich as bishop of the American-Canadian Diocese because of his defiance of the church hierarchy. Following his removal, Dionisije brought a civil action in state court challenging the Church's decision, and the Illinois Supreme Court "purported in effect to reinstate Dionisije as Diocesan Bishop," on the ground that the proceedings resulting in his removal failed to comply with church laws and regulations. *Id.,* at 708.

Reversing that judgment, this Court explained that the First Amendment "permit[s] hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." *Id.,* at 724. When ecclesiastical tribunals decide such disputes, we further explained, "the Constitution requires that civil courts accept their decisions as binding upon them." *Id.,* at 725. We thus held that by inquiring into whether the Church had followed its own procedures, the State Supreme Court had "unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals" of the Church. *Id.,* at 720.

Opinion of the Court

## C

Until today, we have not had occasion to consider whether this freedom of a religious organization to select its ministers is implicated by a suit alleging discrimination in employment. The Courts of Appeals, in contrast, have had extensive experience with this issue. Since the passage of Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e *et seq.*, and other employment discrimination laws, the Courts of Appeals have uniformly recognized the existence of a "ministerial exception," grounded in the First Amendment, that precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers.[2]

We agree that there is such a ministerial exception. The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments.

———————

[2] See *Natal* v. *Christian and Missionary Alliance*, 878 F. 2d 1575, 1578 (CA1 1989); *Rweyemamu* v. *Cote*, 520 F. 3d 198, 204–209 (CA2 2008); *Petruska* v. *Gannon Univ.*, 462 F. 3d 294, 303–307 (CA3 2006); *EEOC* v. *Roman Catholic Diocese*, 213 F. 3d 795, 800–801 (CA4 2000); *Combs* v. *Central Tex. Annual Conference*, 173 F. 3d 343, 345–350 (CA5 1999); *Hollins* v. *Methodist Healthcare, Inc.*, 474 F. 3d 223, 225–227 (CA6 2007); *Schleicher* v. *Salvation Army*, 518 F. 3d 472, 475 (CA7 2008); *Scharon* v. *St. Luke's Episcopal Presbyterian Hospitals*, 929 F. 2d 360, 362–363 (CA8 1991); *Werft* v. *Desert Southwest Annual Conference*, 377 F. 3d 1099, 1100–1104 (CA9 2004); *Bryce* v. *Episcopal Church*, 289 F. 3d 648, 655–657 (CA10 2002); *Gellington* v. *Christian Methodist Episcopal Church, Inc.*, 203 F. 3d 1299, 1301–1304 (CA11 2000); *EEOC* v. *Catholic Univ.*, 83 F. 3d 455, 460–463 (CADC 1996).

According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

The EEOC and Perich acknowledge that employment discrimination laws would be unconstitutional as applied to religious groups in certain circumstances. They grant, for example, that it would violate the First Amendment for courts to apply such laws to compel the ordination of women by the Catholic Church or by an Orthodox Jewish seminary. Brief for Federal Respondent 31; Brief for Respondent Perich 35–36. According to the EEOC and Perich, religious organizations could successfully defend against employment discrimination claims in those circumstances by invoking the constitutional right to freedom of association—a right "implicit" in the First Amendment. *Roberts* v. *United States Jaycees*, 468 U. S. 609, 622 (1984). The EEOC and Perich thus see no need—and no basis—for a special rule for ministers grounded in the Religion Clauses themselves.

We find this position untenable. The right to freedom of association is a right enjoyed by religious and secular groups alike. It follows under the EEOC's and Perich's view that the First Amendment analysis should be the same, whether the association in question is the Lutheran Church, a labor union, or a social club. See Perich Brief 31; Tr. of Oral Arg. 28. That result is hard to square with the text of the First Amendment itself, which gives special solicitude to the rights of religious organizations. We cannot accept the remarkable view that the Religion Clauses have nothing to say about a religious organization's freedom to select its own ministers.

The EEOC and Perich also contend that our decision in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), precludes recognition of a ministerial exception. In *Smith*, two members of the

Native American Church were denied state unemployment benefits after it was determined that they had been fired from their jobs for ingesting peyote, a crime under Oregon law. We held that this did not violate the Free Exercise Clause, even though the peyote had been ingested for sacramental purposes, because the "right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.,* at 879 (internal quotation marks omitted).

It is true that the ADA's prohibition on retaliation, like Oregon's prohibition on peyote use, is a valid and neutral law of general applicability. But a church's selection of its ministers is unlike an individual's ingestion of peyote. *Smith* involved government regulation of only outward physical acts. The present case, in contrast, concerns government interference with an internal church decision that affects the faith and mission of the church itself. See *id.,* at 877 (distinguishing the government's regulation of "physical acts" from its "lend[ing] its power to one or the other side in controversies over religious authority or dogma"). The contention that *Smith* forecloses recognition of a ministerial exception rooted in the Religion Clauses has no merit.

## III

Having concluded that there is a ministerial exception grounded in the Religion Clauses of the First Amendment, we consider whether the exception applies in this case. We hold that it does.

Every Court of Appeals to have considered the question has concluded that the ministerial exception is not limited to the head of a religious congregation, and we agree. We are reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a minister. It is enough

for us to conclude, in this our first case involving the ministerial exception, that the exception covers Perich, given all the circumstances of her employment.

To begin with, Hosanna-Tabor held Perich out as a minister, with a role distinct from that of most of its members. When Hosanna-Tabor extended her a call, it issued her a "diploma of vocation" according her the title "Minister of Religion, Commissioned." App. 42. She was tasked with performing that office "according to the Word of God and the confessional standards of the Evangelical Lutheran Church as drawn from the Sacred Scriptures." *Ibid.* The congregation prayed that God "bless [her] ministrations to the glory of His holy name, [and] the building of His church." *Id.,* at 43. In a supplement to the diploma, the congregation undertook to periodically review Perich's "skills of ministry" and "ministerial responsibilities," and to provide for her "continuing education as a professional person in the ministry of the Gospel." *Id.,* at 49.

Perich's title as a minister reflected a significant degree of religious training followed by a formal process of commissioning. To be eligible to become a commissioned minister, Perich had to complete eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher. She also had to obtain the endorsement of her local Synod district by submitting a petition that contained her academic transcripts, letters of recommendation, personal statement, and written answers to various ministry-related questions. Finally, she had to pass an oral examination by a faculty committee at a Lutheran college. It took Perich six years to fulfill these requirements. And when she eventually did, she was commissioned as a minister only upon election by the congregation, which recognized God's call to her to teach. At that point, her call could be rescinded only upon a supermajority vote of the congregation—a protection designed to allow her to

"preach the Word of God boldly." Brief for Lutheran Church-Missouri Synod as *Amicus Curiae* 15.

Perich held herself out as a minister of the Church by accepting the formal call to religious service, according to its terms. She did so in other ways as well. For example, she claimed a special housing allowance on her taxes that was available only to employees earning their compensation "'in the exercise of the ministry.'" App. 220 ("If you are not conducting activities 'in the exercise of the ministry,' you cannot take advantage of the parsonage or housing allowance exclusion" (quoting Lutheran Church-Missouri Synod Brochure on Whether the IRS Considers Employees as a Minister (2007)). In a form she submitted to the Synod following her termination, Perich again indicated that she regarded herself as a minister at Hosanna-Tabor, stating: "I feel that God is leading me to serve in the teaching ministry . . . . I am anxious to be in the teaching ministry again soon." App. 53.

Perich's job duties reflected a role in conveying the Church's message and carrying out its mission. Hosanna-Tabor expressly charged her with "lead[ing] others toward Christian maturity" and "teach[ing] faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church." *Id.,* at 48. In fulfilling these responsibilities, Perich taught her students religion four days a week, and led them in prayer three times a day. Once a week, she took her students to a school-wide chapel service, and—about twice a year—she took her turn leading it, choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible. During her last year of teaching, Perich also led her fourth graders in a brief devotional exercise each morning. As a source of religious instruction, Perich performed an important role in transmitting the Lutheran faith to the next generation.

In light of these considerations—the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church—we conclude that Perich was a minister covered by the ministerial exception.

In reaching a contrary conclusion, the Court of Appeals committed three errors. First, the Sixth Circuit failed to see any relevance in the fact that Perich was a commissioned minister. Although such a title, by itself, does not automatically ensure coverage, the fact that an employee has been ordained or commissioned as a minister is surely relevant, as is the fact that significant religious training and a recognized religious mission underlie the description of the employee's position. It was wrong for the Court of Appeals—and Perich, who has adopted the court's view, see Perich Brief 45—to say that an employee's title does not matter.

Second, the Sixth Circuit gave too much weight to the fact that lay teachers at the school performed the same religious duties as Perich. We express no view on whether someone with Perich's duties would be covered by the ministerial exception in the absence of the other considerations we have discussed. But though relevant, it cannot be dispositive that others not formally recognized as ministers by the church perform the same functions— particularly when, as here, they did so only because commissioned ministers were unavailable.

Third, the Sixth Circuit placed too much emphasis on Perich's performance of secular duties. It is true that her religious duties consumed only 45 minutes of each workday, and that the rest of her day was devoted to teaching secular subjects. The EEOC regards that as conclusive, contending that any ministerial exception "should be limited to those employees who perform exclusively religious functions." Brief for Federal Respondent 51. We

cannot accept that view. Indeed, we are unsure whether any such employees exist. The heads of congregations themselves often have a mix of duties, including secular ones such as helping to manage the congregation's finances, supervising purely secular personnel, and overseeing the upkeep of facilities.

Although the Sixth Circuit did not adopt the extreme position pressed here by the EEOC, it did regard the relative amount of time Perich spent performing religious functions as largely determinative. The issue before us, however, is not one that can be resolved by a stopwatch. The amount of time an employee spends on particular activities is relevant in assessing that employee's status, but that factor cannot be considered in isolation, without regard to the nature of the religious functions performed and the other considerations discussed above.

Because Perich was a minister within the meaning of the exception, the First Amendment requires dismissal of this employment discrimination suit against her religious employer. The EEOC and Perich originally sought an order reinstating Perich to her former position as a called teacher. By requiring the Church to accept a minister it did not want, such an order would have plainly violated the Church's freedom under the Religion Clauses to select its own ministers.

Perich no longer seeks reinstatement, having abandoned that relief before this Court. See Perich Brief 58. But that is immaterial. Perich continues to seek frontpay in lieu of reinstatement, backpay, compensatory and punitive damages, and attorney's fees. An award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination. Such relief would depend on a determination that Hosanna-Tabor was wrong to have relieved Perich of her position, and it is precisely such a ruling that is barred by

the ministerial exception.[3]

The EEOC and Perich suggest that Hosanna-Tabor's asserted religious reason for firing Perich—that she violated the Synod's commitment to internal dispute resolution—was pretextual. That suggestion misses the point of the ministerial exception. The purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter "strictly ecclesiastical," *Kedroff*, 344 U. S., at 119—is the church's alone.[4]

## IV

The EEOC and Perich foresee a parade of horribles that will follow our recognition of a ministerial exception to employment discrimination suits. According to the EEOC and Perich, such an exception could protect religious organizations from liability for retaliating against employ-

—————

[3] Perich does not dispute that if the ministerial exception bars her retaliation claim under the ADA, it also bars her retaliation claim under Michigan law.

[4] A conflict has arisen in the Courts of Appeals over whether the ministerial exception is a jurisdictional bar or a defense on the merits. Compare *Hollins*, 474 F. 3d, at 225 (treating the exception as jurisdictional); and *Tomic* v. *Catholic Diocese of Peoria*, 442 F. 3d 1036, 1038–1039 (CA7 2006) (same), with *Petruska*, 462 F. 3d, at 302 (treating the exception as an affirmative defense); *Bryce*, 289 F. 3d, at 654 (same); *Bollard* v. *California Province of Soc. of Jesus*, 196 F. 3d 940, 951 (CA9 1999) (same); and *Natal*, 878 F. 2d, at 1576 (same). We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is "whether the allegations the plaintiff makes entitle him to relief," not whether the court has "power to hear [the] case." *Morrison* v. *National Australia Bank Ltd.*, 561 U. S. ___, ___ (2010) (slip op., at 4–5) (internal quotation marks omitted). District courts have power to consider ADA claims in cases of this sort, and to decide whether the claim can proceed or is instead barred by the ministerial exception.

ees for reporting criminal misconduct or for testifying before a grand jury or in a criminal trial. What is more, the EEOC contends, the logic of the exception would confer on religious employers "unfettered discretion" to violate employment laws by, for example, hiring children or aliens not authorized to work in the United States. Brief for Federal Respondent 29.

Hosanna-Tabor responds that the ministerial exception would not in any way bar criminal prosecutions for interfering with law enforcement investigations or other proceedings. Nor, according to the Church, would the exception bar government enforcement of general laws restricting eligibility for employment, because the exception applies only to suits by or on behalf of ministers themselves. Hosanna-Tabor also notes that the ministerial exception has been around in the lower courts for 40 years, see *McClure* v. *Salvation Army*, 460 F. 2d 553, 558 (CA5 1972), and has not given rise to the dire consequences predicted by the EEOC and Perich.

The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception to other circumstances if and when they arise.

\*    \*    \*

The interest of society in the enforcement of employment discrimination statutes is undoubtedly important. But so too is the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission. When a minister who has been fired sues her church alleging that her termination was dis-

criminatory, the First Amendment has struck the balance for us.  The church must be free to choose those who will guide it on its way.

The judgment of the Court of Appeals for the Sixth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 10–553

HOSANNA-TABOR EVANGELICAL LUTHERAN
CHURCH AND SCHOOL, PETITIONER *v.*
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[January 11, 2012]

JUSTICE THOMAS, concurring.

I join the Court's opinion. I write separately to note
that, in my view, the Religion Clauses require civil courts
to apply the ministerial exception and to defer to a reli-
gious organization's good-faith understanding of who
qualifies as its minister. As the Court explains, the Reli-
gion Clauses guarantee religious organizations autonomy
in matters of internal governance, including the selection
of those who will minister the faith. A religious organi-
zation's right to choose its ministers would be hollow,
however, if secular courts could second-guess the organiza-
tion's sincere determination that a given employee is a
"minister" under the organization's theological tenets.
Our country's religious landscape includes organizations
with different leadership structures and doctrines that
influence their conceptions of ministerial status. The
question whether an employee is a minister is itself reli-
gious in nature, and the answer will vary widely. Judicial
attempts to fashion a civil definition of "minister" through
a bright-line test or multi-factor analysis risk disad-
vantaging those religious groups whose beliefs, practices,
and membership are outside of the "mainstream" or
unpalatable to some. Moreover, uncertainty about wheth-

er its ministerial designation will be rejected, and a corresponding fear of liability, may cause a religious group to conform its beliefs and practices regarding "ministers" to the prevailing secular understanding.  See *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327, 336 (1987) ("[I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious.  The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission.  Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission" (footnote omitted)).  These are certainly dangers that the First Amendment was designed to guard against.

The Court thoroughly sets forth the facts that lead to its conclusion that Cheryl Perich was one of Hosanna-Tabor's ministers, and I agree that these facts amply demonstrate Perich's ministerial role.  But the evidence demonstrates that Hosanna-Tabor sincerely considered Perich a minister.  That would be sufficient for me to conclude that Perich's suit is properly barred by the ministerial exception.

# SUPREME COURT OF THE UNITED STATES

No. 10–553

HOSANNA-TABOR EVANGELICAL LUTHERAN
CHURCH AND SCHOOL, PETITIONER *v.*
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[January 11, 2012]

JUSTICE ALITO, with whom JUSTICE KAGAN joins,
concurring.

I join the Court's opinion, but I write separately to
clarify my understanding of the significance of formal
ordination and designation as a "minister" in determining
whether an "employee"[1] of a religious group falls within
the so-called "ministerial" exception. The term "minister"
is commonly used by many Protestant denominations to
refer to members of their clergy, but the term is rarely if
ever used in this way by Catholics, Jews, Muslims, Hin-
dus, or Buddhists.[2] In addition, the concept of ordination
as understood by most Christian churches and by Judaism

------

[1] It is unconventional to refer to many persons who clearly fall with-
in the "ministerial" exception, such as Protestant ministers, Catholic
priests, and Jewish rabbis, as "employees," but I use the term in the
sense in which it is used in the antidiscrimination laws that are often
implicated in cases involving the exception. See, *e.g.*, 42 U. S. C.
§2000e(f) (Title VII); §12111(4) (ADA); 29 U. S. C. §630(f) (ADEA);
§206(e) (Equal Pay Act and Fair Labor Standards Act).

[2] See 9 Oxford English Dictionary 818 (2d ed. 1989) (def. 4(b)) (noting
the term "minister" used in various phrases "applied as general desig-
nations for a person officially charged with spiritual functions in the
Christian Church"); 9 Encyclopedia of Religion 6044–6045 (2d ed.
2005). See also*, e.g.,* 9 New Catholic Encyclopedia 870 (1967).

has no clear counterpart in some Christian denominations and some other religions. Because virtually every religion in the world is represented in the population of the United States, it would be a mistake if the term "minister" or the concept of ordination were viewed as central to the important issue of religious autonomy that is presented in cases like this one. Instead, courts should focus on the function performed by persons who work for religious bodies.

The First Amendment protects the freedom of religious groups to engage in certain key religious activities, including the conducting of worship services and other religious ceremonies and rituals, as well as the critical process of communicating the faith. Accordingly, religious groups must be free to choose the personnel who are essential to the performance of these functions.

The "ministerial" exception should be tailored to this purpose. It should apply to any "employee" who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith. If a religious group believes that the ability of such an employee to perform these key functions has been compromised, then the constitutional guarantee of religious freedom protects the group's right to remove the employee from his or her position.

I

Throughout our Nation's history, religious bodies have been the preeminent example of private associations that have "act[ed] as critical buffers between the individual and the power of the State." *Roberts* v. *United States Jaycees*, 468 U. S. 609, 619 (1984). In a case like the one now before us—where the goal of the civil law in question, the elimination of discrimination against persons with disabilities, is so worthy—it is easy to forget that the autonomy

of religious groups, both here in the United States and abroad, has often served as a shield against oppressive civil laws. To safeguard this crucial autonomy, we have long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs. The Constitution guarantees religious bodies "independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff* v. *Saint Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U. S. 94, 116 (1952).

Religious autonomy means that religious authorities must be free to determine who is qualified to serve in positions of substantial religious importance. Different religions will have different views on exactly what qualifies as an important religious position, but it is nonetheless possible to identify a general category of "employees" whose functions are essential to the independence of practically all religious groups. These include those who serve in positions of leadership, those who perform important functions in worship services and in the performance of religious ceremonies and rituals, and those who are entrusted with teaching and conveying the tenets of the faith to the next generation.

Applying the protection of the First Amendment to roles of religious leadership, worship, ritual, and expression focuses on the objective functions that are important for the autonomy of any religious group, regardless of its beliefs. As we have recognized in a similar context, "[f]orcing a group to accept certain members may impair [its ability] to express those views, and only those views, that it intends to express." *Boy Scouts of America* v. *Dale,* 530 U. S. 640, 648 (2000). That principle applies with special force with respect to religious groups, whose very

existence is dedicated to the collective expression and propagation of shared religious ideals. See *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 882 (1990) (noting that the constitutional interest in freedom of association may be "reinforced by Free Exercise Clause concerns"). As the Court notes, the First Amendment "gives special solicitude to the rights of religious organizations," *ante,* at 14, but our expressive-association cases are nevertheless useful in pointing out what those essential rights are. Religious groups are the archetype of associations formed for expressive purposes, and their fundamental rights surely include the freedom to choose who is qualified to serve as a voice for their faith.

When it comes to the expression and inculcation of religious doctrine, there can be no doubt that the messenger matters. Religious teachings cover the gamut from moral conduct to metaphysical truth, and both the content and credibility of a religion's message depend vitally on the character and conduct of its teachers. A religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses. For this reason, a religious body's right to self-governance must include the ability to select, and to be selective about, those who will serve as the very "embodiment of its message" and "its voice to the faithful." *Petruska* v. *Gannon Univ.*, 462 F. 3d 294, 306 (CA3 2006). A religious body's control over such "employees" is an essential component of its freedom to speak in its own voice, both to its own members and to the outside world.

The connection between church governance and the free dissemination of religious doctrine has deep roots in our legal tradition:

> "The right to organize voluntary religious associations to assist in the expression and dissemination of any

religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Watson* v. *Jones*, 13 Wall. 679, 728–729 (1872).

The "ministerial" exception gives concrete protection to the free "expression and dissemination of any religious doctrine." The Constitution leaves it to the collective conscience of each religious group to determine for itself who is qualified to serve as a teacher or messenger of its faith.

## II

### A

The Court's opinion today holds that the "ministerial" exception applies to Cheryl Perich (hereinafter respondent), who is regarded by the Lutheran Church—Missouri Synod as a commissioned minister. But while a ministerial title is undoubtedly relevant in applying the First Amendment rule at issue, such a title is neither necessary nor sufficient. As previously noted, most faiths do not employ the term "minister," and some eschew the concept of formal ordination.[3] And at the opposite end of the spec-

---

[3] In Islam, for example, "every Muslim can perform the religious rites, so there is no class or profession of ordained clergy. Yet there are religious leaders who are recognized for their learning and their ability to lead communities of Muslims in prayer, study, and living according to the teaching of the Qur'an and Muslim law." 10 Encyclopedia of Religion 6858 (2d ed. 2005).

trum, some faiths consider the ministry to consist of all or a very large percentage of their members.[4]   Perhaps this explains why, although every circuit to consider the issue has recognized the "ministerial" exception, no circuit has made ordination status or formal title determinative of the exception's applicability.

The Fourth Circuit was the first to use the term "ministerial exception," but in doing so it took pains to clarify that the label was a mere shorthand.  See *Rayburn* v. *General Conference of Seventh-day Adventists*, 772 F. 2d 1164, 1168 (1985) (noting that the exception's applicability "does not depend upon ordination but upon the function of the position").   The Fourth Circuit traced the exception back to *McClure* v. *Salvation Army*, 460 F. 2d 553 (CA5 1972), which invoked the Religion Clauses to bar a Title VII sex-discrimination suit brought by a woman who was described by the court as a Salvation Army "minister," *id.,* at 554, although her actual title was "officer."   See *McClure* v. *Salvation Army*, 323 F. Supp. 1100, 1101 (ND Ga. 1971). A decade after *McClure*, the Fifth Circuit made clear that formal ordination was not necessary for the "ministerial" exception to apply.   The court held that the members of the faculty at a Baptist seminary were covered by the exception because of their religious function in conveying church doctrine, even though some of them were not ordained ministers.  See *EEOC* v. *Southwestern Baptist Theological Seminary*, 651 F. 2d 277 (1981).

The functional consensus has held up over time, with the D. C. Circuit recognizing that "[t]he ministerial exception has not been limited to members of the clergy." *EEOC* v. *Catholic Univ.*, 83 F. 3d 455, 461 (1996).   The

───────────

[4] For instance, Jehovah's Witnesses consider all baptized disciples to be ministers. See The Watchtower, Who Are God's Ministers Today? Nov. 15, 2000, p. 16 ("According to the Bible, all Jehovah's worshippers— heavenly and earthly—are ministers").

court in that case rejected a Title VII suit brought by a Catholic nun who claimed that the Catholic University of America had denied her tenure for a canon-law teaching position because of her gender. The court noted that "members of the Canon Law Faculty perform the vital function of instructing those who will in turn interpret, implement, and teach the law governing the Roman Catholic Church and the administration of its sacraments. Although Sister McDonough is not a priest, she is a member of a religious order who sought a tenured professorship in a field that is of fundamental importance to the spiritual mission of her Church." *Id.*, at 464. See also *Natal* v. *Christian and Missionary Alliance*, 878 F. 2d 1575, 1578 (CA1 1989) (stating that "a religious organization's fate is inextricably bound up with those whom it entrusts with the responsibilities of preaching its word and ministering to its adherents," and noting "the difficulties inherent in separating the message from the messenger").

The Ninth Circuit too has taken a functional approach, just recently reaffirming that "the ministerial exception encompasses more than a church's ordained ministers." *Alcazar* v. *Corp. of Catholic Archbishop of Seattle*, 627 F. 3d 1288, 1291 (2010) (en banc); see also *Elvig* v. *Calvin Presbyterian Church,* 375 F. 3d 951, 958 (2004). The Court's opinion today should not be read to upset this consensus.

## B

The ministerial exception applies to respondent because, as the Court notes, she played a substantial role in "conveying the Church's message and carrying out its mission." *Ante*, at 17. She taught religion to her students four days a week and took them to chapel on the fifth day. She led them in daily devotional exercises, and led them in prayer three times a day. She also alternated with the other teachers in planning and leading worship services at

the school chapel, choosing liturgies, hymns, and read-
ings, and composing and delivering a message based on
Scripture.

It makes no difference that respondent also taught
secular subjects. While a purely secular teacher would not
qualify for the "ministerial" exception, the constitutional
protection of religious teachers is not somehow diminished
when they take on secular functions in addition to their
religious ones. What matters is that respondent played an
important role as an instrument of her church's religious
message and as a leader of its worship activities. Because
of these important religious functions, Hosanna-Tabor had
the right to decide for itself whether respondent was reli-
giously qualified to remain in her office.

Hosanna-Tabor discharged respondent because she
threatened to file suit against the church in a civil court.
This threat contravened the Lutheran doctrine that dis-
putes among Christians should be resolved internally
without resort to the civil court system and all the legal
wrangling it entails.[5] In Hosanna-Tabor's view, respond-
ent's disregard for this doctrine compromised her religious
function, disqualifying her from serving effectively as a
voice for the church's faith. Respondent does not dispute
that the Lutheran Church subscribes to a doctrine of
internal dispute resolution, but she argues that this was a
mere pretext for her firing, which was really done for
nonreligious reasons.

For civil courts to engage in the pretext inquiry that
respondent and the Solicitor General urge us to sanction

———————

[5] See The Lutheran Church—Missouri Synod, Commission on Theol-
ogy and Church Relations, 1 Corinthians 6:1–11: An Exegetical Study,
p. 10 (Apr. 1991) (stating that instead of suing each other, Christians
should seek "an amicable settlement of differences by means of a
decision by fellow Christians"). See also 1 Corinthians 6:1–7 ("If any of
you has a dispute with another, dare he take it before the ungodly for
judgment instead of before the saints?").

would dangerously undermine the religious autonomy that lower court case law has now protected for nearly four decades. In order to probe the *real reason* for respondent's firing, a civil court—and perhaps a jury—would be required to make a judgment about church doctrine. The credibility of Hosanna-Tabor's asserted reason for terminating respondent's employment could not be assessed without taking into account both the importance that the Lutheran Church attaches to the doctrine of internal dispute resolution and the degree to which that tenet compromised respondent's religious function. If it could be shown that this belief is an obscure and minor part of Lutheran doctrine, it would be much more plausible for respondent to argue that this doctrine was not the real reason for her firing. If, on the other hand, the doctrine is a central and universally known tenet of Lutheranism, then the church's asserted reason for her discharge would seem much more likely to be nonpretextual. But whatever the truth of the matter might be, the mere adjudication of such questions would pose grave problems for religious autonomy: It would require calling witnesses to testify about the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission.

At oral argument, both respondent and the United States acknowledged that a pretext inquiry would sometimes be prohibited by principles of religious autonomy, and both conceded that a Roman Catholic priest who is dismissed for getting married could not sue the church and claim that his dismissal was actually based on a ground forbidden by the federal antidiscrimination laws. See Tr. of Oral Arg. 38–39, 50. But there is no principled basis for proscribing a pretext inquiry in such a case while permitting it in a case like the one now before us. The

Roman Catholic Church's insistence on clerical celibacy
may be much better known than the Lutheran Church's
doctrine of internal dispute resolution, but popular famili-
arity with a religious doctrine cannot be the determinative
factor.

What matters in the present case is that Hosanna-Tabor
believes that the religious function that respondent per-
formed made it essential that she abide by the doctrine of
internal dispute resolution; and the civil courts are in no
position to second-guess that assessment. This conclusion
rests not on respondent's ordination status or her formal
title, but rather on her functional status as the type of
employee that a church must be free to appoint or dismiss
in order to exercise the religious liberty that the First
Amendment guarantees.